EDWARD BERNHARDT, Appellant, v. WILLIAM D. LUKE, JAMES L. LUKE, JR., and JOSEPH C. LUKE, Executors under the last Will and Testament of Bessie H. Luke, deceased, Appellees.

(*November* 8, 1956.)

SOUTHERLAND, C. J. and WOLCOTT and BRAMHALL, J. J., sitting.

*Irving Morris* (of Cohen and Morris) for appellant.

*John J. De Luca* and *Joseph A. Julian, Jr.,* for appellees.

Supreme Court of the State of Delaware, No. 19, 1956.

SOUTHERLAND, C. J.:

This is a suit by a real estate broker for commissions. The question before us is whether there was any evidence to support the broker's claim that he had produced a buyer ready and willing to purchase the principal's property on the principal's terms. Plaintiff contends that the evidence upon the matter is conflicting and that summary judgment was erroneously granted.

The facts are these:

Bessie H. Luke in her lifetime owned a house and land on Gilpin Avenue in Wilmington. She died in 1954. By her will she named her three sons as executors with full power to sell her real estate. An exclusive agency was given to a broker for a short period, but no sale was forthcoming. In September, 1954, a sign was placed on the property reading: "For Sale, Apply Your Own Broker". Matas, a real estate agent associated with plaintiff Bernhardt, saw the sign and communicated with one of the executors, William D. Luke. Luke gave Matas a price of $30,000. No other terms were specified, and Matas did not ask for any.

Matas interested E. J. Frankel in the property. In April, 1955, Matas presented to Luke proposed contracts for the sale of the property to Frankel for $30,000. These contracts were made out in the name of Bessie H. Luke. The contracts provided for final settlement on or before October 14, and contained a warranty respecting zoning. Luke raised no objection to the contracts, but told Matas he would submit them to his attorney, John J. De Luca, Esquire, "to see that everything was in order." Matas subsequently called on De Luca. What was said is in dispute. For our present purpose, we take Matas' version of the conversation. De Luca asked him if it was possible to advance the settlement date to June 15, because he wanted "to close out the estate", and whether he could get Frankel's consent to remove some bushes from the property. Matas said he would take up these matters with his client. Then there was a further discussion and De Luca said: "Let us forget about it, because I think I can settle it in October." De Luca indicated some apprehension that if he insisted upon settlement on June 15, his clients might lose the sale. He told Matas to "pick up the signed contract" on April 22. De Luca then told Matas that "there were three brothers involved", and took from his files a copy of a will. This was the first time that Matas knew that there were three executors involved, although Luke had told him that Bessie H. Luke was deceased.

On April 19 De Luca telephoned Matas and told Matas that he had received an offer of $33,000 net, and that he would give Matas' client preference if he would pay $33,000 net and accept a settlement date of June 15. Matas telephoned Frankel, who was not interested.

Matas subsequently made demand on William D. Luke for a commission, on the ground that he had produced a buyer at the stipulated price. The demand was refused, and plaintiff brought suit.

Depositions were taken, and both sides moved for summary judgment. The trial court granted the defendants' motion and plaintiff appeals.

The trial judge held (1) that, because of the delayed settlement date in the contract tendered by Matas, he had failed to produce a buyer willing to purchase on defendants' terms, and in effect had produced nothing but a counter-offer; and (2) that is was admitted that De Luca told Matas that the delayed settlement date was one reason for rejecting the counter-offer. The second holding is an obvious reference to the DeLuca telephone call of April 19.

Plaintiff contends that his evidence shows that the contract tendered by Matas was not rejected because of the delayed settlement date; on the contrary, he says, the contract as tendered was satisfactory to both William D. Luke and De Luca; nothing but formal signature was needed to perfect it; and his contract was rejected only because a better offer was made. Since neither Luke nor his attorney objected to the delayed settlement date when he produced his contract, he says, they could not thereafter use it as an excuse for avoiding liability for a commission. He says, moreover, that if the settlement date was important to the executors, he should have been given an opportunity to meet it at the price previously fixed ($30,000). He invokes the rule that "where a seller refuses an offer to purchase land at the price he has set without stating the ground for his refusal, he cannot assert the ground in defense of the broker's action for compensation". 156 *A. L. R.* 602.

As the court below held, this rule applies to a case where, at the time of rejecting the offer, the principal either gives no reason whatever, or gives a specified reason, and later, in defending a claim for commission, attempts to justify his action on a ground not theretofore specified. In the instant case, De Luca at the first interview did raise the question of the settlement date, and took the contracts under advisement to consult his clients. As the matter then stood, plaintiff had failed to produce a buyer willing to meet the principals' terms. On their face the Matas contracts amounted to a counter-offer. This is so because the only term specified to the agent by the executors was the purchase price. In such a case a sale for cash, or

settlement within a reasonable time, is implied. See 18 *A. L. R.* 2d 382. The Matas contracts did not comply with the principals' terms, because a delay of six months is not a usual or reasonable time for the settlement of a real estate transfer. What De Luca did was to take the matter under advisement so that he could consult his principal. Later he specifically assigned the delayed settlement date as one condition that Frankel must meet. That he also imposed another condition—a higher price—is immaterial. The argument that the executors were required to offer the agent an opportunity to meet the principals' original terms we cannot follow. It amounts to saying that one who rejects a counter-offer must renew his original offer—a proposition obviously unsound. When Matas offered his contract, he took the risk that the special terms he had included would be satisfactory to the Lukes. Unless they were accepted, there was no liability to him for commission. *Cf. Delaware Apartments Inc. v. John J. Monaghan Co.,* 6 *Terry* (45 *Del.*) 75, 82, 69 *A.* 2d 242.

■ But it is insisted that the statements and acts of the executor, William D. Luke, and his attorney, Mr. De Luca, amounted to an acceptance of the contract as drawn. We do not think so, for two reasons.

(1) In the first place, Luke's statements that he "guessed it was all right" and would refer the contract to his attorney amounted to nothing more than an observation of his first impression of the matter, and a desire to consult his attorney about it. It was not an outright or binding acceptance of the counter-offer.

It is said, alternatively, that if not an acceptance of the Matas contract, Luke's statement was a delegation to the attorney of the decision whether the terms were satisfactory, and that the attorney accepted the contract. Passing over the question of the right of an executor—a fiduciary—to delegate such a decision to an attorney, we do not think that Luke's statements are subject to any such interpretation. A reference by a client to his counsel of a proposed contract for examination is on its

face a reference for the purpose of receiving counsel's opinion and recommendations—not a direction to take final action on the matter. Of course De Luca had no implied authority to make a sale for his clients.

Nor do we think that De Luca's statements can be fairly interpreted as assuming an authority that he did not possess. His statements amounted in effect to nothing more than expressions of belief that the contract might be acceptable, and a statement that he would take the matter up with his principals.

(2) In the second place, we fail to find any evidence that Luke had any authority to assent, on behalf of his co-executors, to the unusual term that Matas had included—a delay of six months for settlement—or to authorize De Luca to do so. The authority of executors to sell real estate is derived either from the will or from court order. The testamentary power, if given to two or more executors, must be exercised by all, for the confidence reposed by the decedent is reposed in them all. *In re Simmons' Estate*, 254 *Pa.* 231, 98 *A.* 871. And such testimony as touches the point indicates that the decisions respecting the sale of the property were joint decisions—not those of William D. Luke alone. This is not a mere technical point. Any one of three executors might well object to a suggestion that an estate be held open for several months for the convenience of a purchaser of real estate. At all events, there is nothing in the record showing any authority in a single executor of the estate to effect a sale or specify its terms. Since plaintiff as well as defendant, filed a motion for summary judgment, we may infer that he had developed his whole case.

For both the reasons above discussed, we are in accord with the decision below.

The judgment of the Superior Court of New Castle County is affirmed.