# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| NEW START HOLDINGS, LLC., including protected series 22 6th Series and 804 Marshall Series and CHENXI LI, | ) ) ) ) ) | |
| Plaintiffs/Counterclaim Defendants, | ) ) ) ) | |
| v. | ) ) | C.A. No. 2019-0831-MTZ |
| ZI JUN ZHOU, and MARVIN DANIELS, as Trustee of the 804 Marshall Trust and the 22 Sixth Avenue Trust, | ) ) ) ) ) | |
| Defendants/Counterclaim Plaintiffs. | ) ) ) | |
| ZI JUN ZHOU, and MARVIN DANIELS, as Trustee of the 804 Marshall Trust and the 22 Sixth Avenue Trust, | ) ) ) ) ) | |
| Third-Party Plaintiffs, | ) ) | |
| v. | ) ) | |
| US DOUBLE FOREST ENTERPRISE INC., | ) ) ) ) | |
| Third-Party Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: April 5, 2024
Date Decided: September 4, 2024

John L. Williams, Brian C. Crawford, THE WILLIAMS LAW FIRM, P.A., Wilmington, Delaware, *Attorneys for Plaintiffs/Counterclaim Defendants, New Start Holdings, LLC, and Chenxi Li, and Third-Party Defendant US Double Forest Enterprise, Inc.*

Zi Jun Zhou, Defendant/Counterclaim Plaintiff and Third-Party Plaintiff, *pro se.*

Marvin Daniels, Defendant/Counterclaim Plaintiff and Third-Party Plaintiff, *pro se.*

**ZURN, Vice Chancellor.**

A lie rarely goes undetected. It grates against the truth with a telling scratch or squeal. When a plaintiff comes to this Court with claims based on lies, trial sets the lie against the truth, and—we hope and intend—gives the lie away. When that happens, the doors of this Court of equity close against the plaintiff.

So here. Plaintiff Chenxi Li ("Ci Ci") and her holding company New Start Holdings, LLC ("New Start," and together with Ci Ci, "Plaintiffs") approached this Court insisting New Start had purchased two residential rental properties from defendant Zi Jun Zhou ("Wallace").[1] Ci Ci described Wallace as her real estate agent and property manager. She insisted her parents' role from China was limited to bankrolling her own endeavors. According to Ci Ci, she was ready, willing, and able to close on the two properties, but Wallace absconded with the roughly $180,000 her family sent him to purchase those two properties. She came to this Court seeking specific performance and damages.

Nuances of the transactions do not make sense under Plaintiffs' story. Wallace came to trial with an explanation. Wallace maintained he had teamed up with Ci Ci's father, Shuanglin Li, in a broader enterprise to operate rental properties and to resell residential properties to overseas investors. Li promised Wallace a

_____

[1] Because this action involves two members of the Li family, to avoid confusion, I use Ci Ci's chosen English name, which she used on many of the documents in this case, and Shuanglin Li's family name. I use Wallace's chosen English name out of parity. I intend no familiarity or disrespect.

share in the profits. But at every turn, Li diverted the enterprise's profits to Ci Ci and refused to perform his obligations that would benefit Wallace. Realizing Li would never give Wallace his cut, Wallace walked away from the venture with two of his properties not yet diverted to Ci Ci.

Ci Ci came to this Court to present backdated contracts, evasive testimony, half-truths, and lies. The lies in her story grate against the truth in Wallace's. Her unclean hands in her approach to this Court are dispositive: this Court will not interfere on her behalf. For their part, the defendants have proven the contracts concerning the two disputed properties are unenforceable. The defendants are entitled to declaratory relief, restitution from unjust enrichment, and reasonable attorneys' fees and costs.

## I. BACKGROUND[2]

Finding Wallace's story to be the truth and Ci Ci's to be false, and concluding Ci Ci came to Court with unclean hands, is dispositive of Plaintiffs' claims. The

---

[2] Citations in the form of "Am. Compl." refer to the plaintiffs' verified amended complaint, available at docket item ("D.I.") 29. Citations in the form of "Defs. Ans." refer to the defendants' answer to the verified amended complaint, available at D.I. 33. Citations in the form of "Countercl." refer to the counterclaim plaintiffs' verified counterclaim and third-party complaint, available at D.I. 33. Citations in the form of "PreTB" refer to plaintiffs' and third-party defendant's pretrial brief, available at D.I. 72. Citations in the form of "PTO" refer to the plaintiffs and third-party defendant's pretrial order, available at D.I. 81. Citations in the form of "Tr. (Name of speaker)" refer to the trial transcript, available at D.I. 84 and D.I. 85. Citations in the form of "PostTB" refer to the plaintiffs' and third-party defendant's post-trial brief, available at D.I. 89.

2

factual findings are therefore outcome-determinative in this case. "My duty is to make findings of fact based on the preponderance of the evidence the parties present."[3] "Proof by a preponderance of the evidence means proof that something is more likely than not."[4] The parties have the burden of proving their respective claims, and each "must explain why its version of the facts is the more plausible in a way comprehensible and convincing to the trier of fact; if not, it has failed to carry its burden, and the judge's duty is accordingly clear."[5] Conflicts are resolved by credibility determinations.

Before I proceed to my factfinding mission, I note I have already deemed some facts admitted. The defendants went to trial without legal representation. They did not follow the scheduling order or participate in the drafting of the pretrial order or exhibit list.[6] And there were indications the defendants failed to meet their discovery obligations.[7] Plaintiffs and third party defendant US Double Forest Enterprise, Inc. ("Double Forest" or "Third Party Defendant") requested their proposed facts in the pretrial order be deemed admitted without proof, and that the

---

[3] *Lynch v. Gonzales*, 2020 WL 4381604, at *4 (Del. Ch. July 31, 2020).

[4] *Id.* at *30 (quoting *Martin v. Med-Dev Corp.*, 2015 WL 6472597, at *10 (Del. Ch. Oct. 27, 2015)).

[5] *In re Appraisal of Ancestry.com, Inc.*, 2015 WL 399726, at *1 (Del. Ch. Jan. 30, 2015).

[6] D.I. 80 at 1–2.

[7] *Id.* at 1; D.I. 83 at 5; D.I. 67, Ex. A at 1–2.

3

trial record be limited to their submitted list of exhibits and witnesses.[8] At the pretrial conference on January 29, 2024, I advised the defendants they had until 5:00 p.m. February 1 to file any opposition to deeming Plaintiffs' proposed facts as admitted without proof, and to limiting documents at trial to those Plaintiffs placed on the joint exhibit list.[9] The defendants did not meet this deadline, and on February 2, I granted Plaintiffs' request and entered their proposed pretrial order, deeming the proposed facts admitted, precluding the defendants from using any documents at trial not identified on the joint exhibit list, and prohibiting the defendants from calling any witnesses.[10]

At trial, it became clear Plaintiffs' story that they had urged me to deem admitted was false. Ci Ci refused to answer questions,[11] feigned ignorance of crucial details,[12] acknowledged she failed to produce her text and WeChat communications with Wallace,[13] and did not provide at trial key documents that would have supported

---

[8] D.I. 73 at Ltr.; *id.* at Ex. A.

[9] D.I. 83 at 15–16.

[10] D.I. 80; PTO.

[11] *See, e.g.*, Tr. (Ci Ci) at 108; *id.* (Ci Ci) at 165; *id.* (Ci Ci) at 182.

[12] *See, e.g., id.* (Ci Ci) at 182–83; *id.* (Ci Ci) at 183; *compare id.* (Ci Ci) at 206, *with id.* (Ci Ci) at 98, 160–62.

[13] *Id.* (Ci Ci) at 184–85.

her story.[14]  She repeatedly lied on the stand.[15]  When confronted with her lies, she doubled down.[16]  By contrast, defendants Wallace and the trustee for the disputed properties, Marvin Daniels (together with Wallace, "Defendants"), were straightforward, consistent, and credible.

As Ci Ci's story spun out of control, the equities undergirding my decision to deem Plaintiffs' proposed facts as admitted changed dramatically.  Some of those "facts" were lies.[17]  What was meant to prevent prejudice threatened to deliver injustice.[18]  I have therefore revisited my decision to admit Plaintiffs' proposed facts

---

[14] *See*, *e.g.*, *id*. (Ci Ci) at 182–85; *id.* (Ci Ci) at 63; *id.* (Plaintiff's counsel) at 102.

[15] By way of example, Ci Ci got caught in lies about whether Wallace withheld a commission for a particular property, *compare id*. (Ci Ci) at 49–50, *with id.* (Ci Ci) at 182, and how and whether she sent purportedly signed and sent copies of agreements to Wallace, *compare id.* (Ci Ci) at 29, *with id.* (Ci Ci) at 174–75, *and id*. (Ci Ci) at 192.

[16] For example, on the topic of why a particular purchase fell through, Ci Ci testified that the property was too large for her.  *Id.* at 177.  Wallace pointed out that the home Ci Ci then purchased was even larger.  *Id.* (Wallace) at 195.  Ci Ci responded along the lines that her taste had changed, as the subsequent purchase was two years later.  *Id.* (Ci Ci) at 196.  But it wasn't:  it was eight months later.  *Id.* (Wallace) at 196; *see* JX 4 at -0490; *Id.* (Ci Ci) at 29–30, 174.

[17] *E.g.*, PTO ¶¶ 18, 20–21, 29.

[18] *See Taylor v. Jones*, 2006 WL 1510437, at *6 (Del. Ch. May 25, 2006) ("The 'law of the case' doctrine requires that issues already decided by the same court should be adopted without relitigation" but "[t]he Court is not without some discretion in determining the applicability of 'law of the case' doctrine . . . [and] it is not an absolute bar to reconsideration of a prior decision that is clearly wrong, produces an injustice, or should be revisited because of changed circumstances." (footnote omitted)); *Cede & Co. v. Technicolor, Inc.*, 884 A.2d 26, 39 (Del. 2005).

as admitted without requiring proof.[19]  I will find the facts based on the evidence presented at trial.

Having weighed the evidence and evaluated the credibility of the witnesses, I find the following facts were proven by the preponderance of the evidence.

### A.    Ci Ci Initiates Business Conversations With Wallace.

Wallace first entered the real estate business in 2010 or 2011 as a realtor.[20] But he soon determined he did not enjoy being a real estate agent and stopped accepting new clients in or around 2013.[21]  By 2015, his real estate license had expired, and he had pivoted to being a landlord.[22]  When Ci Ci and Wallace's paths crossed in 2015, Wallace was making his living by acquiring properties and renting them out.[23]

---

[19] *Hamilton v. State*, 831 A.2d 881, 887 (Del. 2003) ("The law of the case doctrine is not intended to preserve error or injustice . . . . [It] does not apply when the previous ruling was clearly in error or there has been an important change in circumstances, in particular, the factual basis for issues previously posed."); *Kenton v. Kenton*, 571 A.2d 778, 784 (Del. 1990) ("The 'law of the case' is established when a specific legal principle is applied to an issue presented by facts which remain constant throughout the subsequent course of the same litigation.").

[20] Tr. (Wallace) at 221.

[21] *Id.* (Wallace) at 222.

[22] *Id.* (Wallace) at 223, 233, 238.

[23] *Id.* (Wallace) at 238.

In 2015, Ci Ci was 22; she had graduated college and moved from Beijing, China to Delaware without her family.[24] She returned to her family in China for the summers, and they frequently visited her in the United States.[25] She enrolled at the University of Delaware, taking classes in the English Language Institute for one year, then entering its master's in business administration program for hospitality and restaurant management.[26]

When Ci Ci first arrived in the United States, she rented a home. The landlord and property manager was Wallace's business colleague,[27] and Wallace had helped him acquire and manage Ci Ci's rental.[28] In 2015, Ci Ci shared with her landlord that she was interested in buying residential properties in the United States, and her landlord introduced her to Wallace before Ci Ci went to China for the summer.[29] Ci Ci told Wallace she would discuss the matter with her family.[30]

---

[24] *Id.* (Ci Ci) at 5–6.

[25] *See id.* (Ci Ci) at 7, 51; *see also id.* (Wallace) at 144 (discussing one of Ci Ci's parents' visits to the United States); *id.* (Ci Ci) at 188 (same).

[26] *Id.* (Ci Ci) at 5.

[27] *Id.* (Ci Ci) at 6.

[28] *Id.* (Ci Ci) at 6, 159.

[29] *Id.* (Ci Ci) at 6–7.

[30] *Id.* (Ci Ci) at 7.

## B.    Li And Wallace Agree To Collaborate And Share Profits.

After visiting her parents that summer, Ci Ci returned to Delaware with her parents.[31] Li met with Wallace, wanting to buy residential real estate.[32] With Ci Ci being a full-time student, Li instructed Wallace that Wallace would be dealing directly with him.[33] Li and Wallace negotiated heavily.[34] They orally agreed upon a two-pronged enterprise:  (1) selling several of Wallace's rental properties to Li for Ci Ci's benefit, and earmarking their rental income for her, and (2) acquiring higher-priced homes and reselling them to Chinese investors at a profit, to be split between Li and Wallace.[35] The first rental prong benefitted Ci Ci at Wallace's expense.  Ci Ci would own the rental properties and receive the rent, which would cover her living expenses in view of difficulties in wiring cash from China.[36] After closing, Wallace would pay Ci Ci the rental amount if the properties were ever unoccupied, and would

---

[31] *Id.* (Ci Ci) at 7, 15; *see also id.* (Wallace) at 95 (indicating Li visited annually).

[32] *Id.* (Wallace) at 224, 236, 238; D.I. 79, Ex. A at 26:16–22 (indicating Wallace met with Ci Ci's parents in the late summer of 2015).  Because Wallace is pro se and Ci Ci has proven to be less than forthright in the materials she submitted to this Court, I have looked to Wallace's sworn deposition testimony to fill in holes in my factfinding.  *See* Ct. Ch. R. 32(a)(3)(E).

[33] *Id.* (Wallace) at 257; *id.* (Wallace) at 316–17 ("[H]e wanted to make sure we do not interrupt Ci Ci's college education, because she was a full-time student . . . . He wanted to make sure that . . . whatever we do will be time-efficient and not to keep . . . bothering his daughter and ask her to do things for us.").

[34] *Id.* (Wallace) at 236.

[35] *Id.* (Wallace) at 236, 239, 245, 262, 326–38.

[36] *Id.* (Wallace) at 245; *id.* (Ci Ci) at 78.

pay for any repairs or maintenance of the property.[37] Wallace would also serve as the property manager at no cost to Ci Ci.[38] If the rental properties were ever sold, Wallace and Li would split the profits.[39]

The rental prong had little to no benefit for Wallace.[40] But if he performed on the rental prong, Li promised the two would resell homes together.[41] Li conditioned the second prong on the first occurring; and Wallace conditioned the first prong on the second.[42] More to the point: Wallace agreed to the unfavorable rental prong because the resale prong promised great returns.[43] The men agreed that Li would fund the purchase of higher priced homes, and they would resell the homes to

---

[37] *Id.* (Wallace) at 148–49, 236, 239, 327–38.

[38] *Id.* (Wallace) at 245; *id.* (Ci Ci) at 11.

[39] *Id.* (Wallace) at 245, 263.

[40] *Id.* (Wallace) at 239, 327; *see id.* (Ci Ci) at 26.

[41] *Id.* (Wallace) at 234–36.

[42] *Id.* (Wallace) at 238–39;); *see* JX 7 at -1570, -1588, -1606 (memorializing these terms in later agreements of sale); *see also* JX 18 at -2080 (indicating Wallace did not replicate these terms in other purchase agreements with a different, more arm's-length buyer); JX 23 at -0359 (same).

[43] Tr. (Wallace) at 239; *id.* (Wallace) at 149 ("[W]hat kind of agreement [do] you think that was? Like, if your dad did not make his, you know, business plan sound so good, why on earth [would] anyone . . . be like, hey, I'm okay, you know, when you guys have seven properties, the rents are, you know, 5 [for] $10,000 a month. Even if the tenants are not paying, I [will] still pay. Even if your property gets damaged, [I] will take money out of my pocket to fix your damage. Who does that?"); *id.* (Wallace) at 150 ("Yes, I did sign all of that . . . . But at the same time, d[id] you ever wonder why on earth I would [sign the agreements]? It's only because your dad promised that he will sell or buy ten properties from me each . . . month, and that's why I did that."); *id.* (Wallace) at 88–91.

9

Chinese investors for a profit, which Wallace and Li would split.[44] Wallace regarded Li as a great businessman and believed Li could take Wallace's business skills "to the next level."[45]

Wallace was no longer licensed as a realtor and believed he was required to be "in order to help them" obtain properties.[46] To solve this problem, even though Wallace usually held on to his rental properties, he sold four of his own rental properties (the "Initial Properties") to Li "for sale by owner," which would not require Wallace to have a license.[47] Wallace provided rental income to Ci Ci on the Initial Properties, which assisted with her living expenses.[48] Sometime in August, Li entered into agreements with Wallace to purchase the Initial Properties.[49] Before and during trial, Plaintiffs' counsel consistently referenced the Initial Properties'

---

[44] *Id.* (Wallace) at 238.

[45] *Id.* (Wallace) at 141. Wallace testified that Li regarded himself as a good businessman, and Wallace as beneath him. *See id.* (Wallace) at 146.

[46] *Id.* (Wallace) at 224.

[47] *Id.* (Wallace) at 238 ("I was always a landlord . . . . I never sell. I only want to rent to people."); *id.* (Wallace) at 224.

[48] *Id.* (Wallace) at 245; Tr. (Wallace) at 328 ("Because, in China, . . . we [are] only allowed to send $50,000. So, by [Ci Ci] going to college, paying for tuition, and living here, renting, $50,000 might not be enough to cover the whole year.").

[49] PreTB at 7 (indicating the parties entered agreements of sale to purchase the Initial Properties "[o]n or around August of 2015"); Tr. (Wallace) at 238 ("[Li] told me, he said, 'Wallace, you sell me these properties . . . .'"); *id.* (Wallace) at 256 ("Li just put up the money and g[a]ve us instructions on what to do. And me and Ci Ci [would] just go execute it. We just go follow his instruction.").

10

purchase agreements and maintained they exist.[50]   But these agreements were not included in Plaintiffs' exhibit list.[51]

The evidence at trial shows Wallace's agreement with Li was broader than the purchase of the Initial Properties.  According to Plaintiffs' counsel, the purchase agreements provided a purchase price of $50,000 for each of the Initial Properties.[52]  Li ultimately paid Wallace far more:  $500,000 in cash, which Wallace received in full by October or November.[53]   Wallace's obligations to cover the rent, serve as

---

[50] *See, e.g.*, *id.* (Ci Ci) at 15; *id.* (Plaintiffs' counsel) at 236; PreTB at 7.

Although Plaintiffs' counsel asserted the purchase agreements existed and conveyed the properties, Ci Ci maintained that December trust agreements conveyed the Initial Properties from Wallace.  *See* Tr. (Ci Ci) at 10 ("I didn't even sign any, like the contract . . . . I just went to [Wallace's] house, and he showed me documents that I need to sign.  So I signed, I believe, something called a trust, and that's it."); *id.* (Ci Ci) at 14 (discussing why Wallace purportedly instructed her to put the properties in trust rather than purchase them outright and explaining "I thought this is the way that people are buying real estate in America"); *id.* (Ci Ci and Wallace) at 125 ("'Is that the same [agreement of sales] I used [for the Initial Properties]?' 'No.  You were using the trust agreement.' 'So you're saying we don't have a legal, binding, signed purchase agreement, we only had a trust agreement?  What happens if I prove to the judge we d[id] sign the purchase agreement?' 'We did sign the contracts you sent to me, including the trust.'").  As explained *infra* note 73, those trust agreements cannot have conveyed the properties from Wallace to Ci Ci or New Start.

[51] D.I. 73, Ex. A; Tr. (Plaintiffs' counsel) at 102 (asserting "the first four contracts are not in the joint exhibits, the ones he is trying to find").

[52] Tr. (Plaintiffs' counsel) at 236 ("[T]he contracts -- which we don't have here today . . . [,] didn't [they] specify $50,000 on each of the four properties as the sale price?").

[53] *Id.* (Ci Ci) at 10; *id.* (Wallace) at 236; *see id.* (Ci Ci) at 14–15 (indicating the payment was made in cash before closing and she signed agreements of purchase around October or November); *id.* (Ci Ci) at 181 (indicating Wallace was paid in full before the purchase agreements were signed).

11

property manager, and pay for repairs and maintenance were not memorialized in the Initial Properties' purchase agreements, but Wallace performed them anyway.[54]

With the Initial Properties and their income stream conveyed to Ci Ci, Wallace and Li began their resale enterprise for higher priced homes, which they referred to as "wholesaling."[55] Wallace was to identify ten homes, and enter into a contract with Wallace "and/or assigns" as the buyer so Wallace would have the option to assign the contract to Li or his designee.[56] Li would then find an overseas cash buyer; because cash-only purchases do not require an appraisal, Li promised he could sell those properties for more than the local residential market would support.[57] The purchase amount would be contributed by a group of individuals who would each wire Wallace $50,000.[58]

Wallace identified the first property to wholesale. His neighbor at 210 Peoples Way ("Peoples Way") was looking to sell.[59] Li instructed Wallace to

---

[54] *Id.* (Plaintiffs' counsel and Wallace) at 240 ("'But on the first four contracts, paragraph 32 did not have the language we were reading yesterday, right?' 'Correct.'"); *see* JX 7 at -1570, -1588, -1606 (memorializing these terms in subsequent agreements of sale); *see* Tr. (Ci Ci) at 11 (indicating she received rent on the Initial Properties from Wallace and that he managed them); PTO ¶¶ 29–30; *see*, *e.g.*, JX 13 at -0478.

[55] Tr. (Wallace) at 203–04, 251.

[56] *Id.* (Wallace) at 226, 257–58; *id.* (Ci Ci and Plaintiffs' counsel) at 19–20.

[57] *Id*. (Wallace) at 239–40.

[58] *Id.* (Ci Ci) at 78; *see*, *e.g.*, JX 2.

[59] Tr. (Ci Ci) at 20, 83.

purchase Peoples Way and assign the executed purchase agreement to Ci Ci.[60] They would then sell Peoples Way at a profit: Li would find an overseas buyer, and Wallace would serve as the realtor.[61] Instead of receiving a commission, Wallace would share in the profits from the sale.[62] To serve as realtor, Wallace asked his old brokerage firm to reactivate his realtor's license.[63]

In November, the Peoples Way sellers agreed to sell the property to Wallace for $795,000 in cash.[64] So that Wallace could assign the agreement to Ci Ci,[65] the contract identified the buyer as "Zi Jun Zhou and or assigns."[66] Wallace signed the contract on November 27, 2015, and a $10,000 nonrefundable deposit was tendered that day.[67] Neither Wallace nor the seller were represented by a realtor.[68] The Li family began wiring the funds for Peoples Way to Wallace on September 24 in

---

[60] *Id.* (Wallace) at 226; *see* JX 4 at -0492.

[61] Tr. (Wallace) at 223, 226.

[62] JX 38 at 13.

[63] Tr. (Wallace) at 223–26, 233.

[64] JX 4 at -0484 § 3; *but see* JX 29 at -2361 (Ci Ci representing to Wallace's property manager that her family attempted to purchase Peoples Way Property at "840k").

[65] Tr. (Wallace) at 225–26.

[66] JX 4 at -0484 § 1; Tr. (Wallace) at 258.

[67] JX 4 at -0484 § 3, -0492.

[68] *Id.* at -0490 § 28.

$50,000 increments to comply with China's restrictions on individual wire payments.[69]  Both prongs of the enterprise were underway.

### C.  Li Causes The Initial Properties To Be Put In Trust.

By December, Li realized he needed Wallace to be able to sign contracts for him and Ci Ci because Li could not easily enter agreements from China, and Ci Ci was frequently unavailable.[70]  Wallace spoke with his attorney, who suggested a trust.[71]  On December 2, four trusts were created, one to hold each of the four Initial Properties.[72]  Conveyance to Ci Ci as trustee was recorded on December 4.[73]

---

[69] JX 2; JX 3; PostTB at 4; Tr. (Wallace) at 328 (discussing $50,000 annual restriction for individual wire payments); *id.* (Daniels and Plaintiffs' counsel) at 206.

[70] Tr. (Wallace) at 237.

[71] *Id.*; *see also id.* at 317 (explaining that with his partner Siew as trustee, he and Siew could sign on Ci Ci's behalf).

[72] JX 1.

[73]  New Castle Cty., Del., *Parcel # 1001020626*, NEWCASTLEDE.GOV, https://www3.newcastlede.gov/parcel/Details/Default.aspx?ParcelKey=85504 (last visited August 30, 2024); New Castle Cty., Del., *Parcel # 0703940240*, NEWCASTLEDE.GOV, https://www3.newcastlede.gov/parcel/Details/Default.aspx?ParcelKey=36794 (last visited Aug. 30, 2024); New Castle Cty., Del., *Parcel # 0703940277*, NEWCASTLEDE.GOV, https://www3.newcastlede.gov/parcel/Details/Default.aspx?ParcelKey=36831 (last visited Aug. 30, 2024); New Castle Cty., Del., *Parcel # 2604110062*, NEWCASTLEDE.GOV, https://www3.newcastlede.gov/parcel/Details/Default.aspx?ParcelKey=178984 (last visited Aug. 30, 2024).  I take judicial notice of these December 4 conveyances to Ci Ci as trustee.  *See Fortis Advisors LLC v. Allergan W.C. Hldg. Inc.*, 2019 WL 5588876, at \*4 (Del. Ch. Oct. 30, 2019) ("Delaware courts have taken judicial notice of publicly available documents that 'are required by law to be filed, and are actually filed, with federal or state officials.'" (quoting *In re Rural Metro Corp. S'holders Litig.*, 2013 WL 6634009, at \*7 (Del. Ch. Dec. 17, 2013)); *Sunrise Ventures, LLC v. Rehoboth Canal Ventures, LLC*, 2010 WL 3638445, at \*10 n.58 (Del. Ch. Jan. 27, 2010) (taking judicial notice of the fact that loans and mortgages were satisfied as of a certain date, as was recorded in the Recorder of

14

Wallace's business partner Kien Bien Siew was the trustee and Ci Ci was the beneficiary.[74] Each trust gave the trustee authority to purchase real property on its behalf; assume mortgages on trust property; sell or dispose of trust property; rent or lease trust property; repair, alter, or tear down trust property; and make rent collections and all other payments that may be due and payable to the trust.[75] In other words, Wallace, through Siew, could now enter various agreements for the Li family.

### D. Li Backs Out Of Peoples Way; Wallace Keeps The Funds.

By the end of December, Li and Wallace's relationship began to deteriorate. The settlement date for Peoples Way was set for February 1, 2016.[76] But even before the new year, Li asked to postpone settlement several times.[77] Then Li did not

---

Deeds of Sussex County, Delaware); *Branch Baking & Tr. Co. v. Eid*, 2013 WL 3353846, at *3 (Del. Super. June 13, 2013) (taking judicial notice of a real property assignment filing with the New Castle County Recorder of Deeds).

At trial, Ci Ci maintained these trust agreements conveyed the Initial Properties from Wallace to the trusts in October or November. Tr. (Ci Ci) at 13–15. These instruments cannot have conveyed the Initial Properties from Wallace, at that time or at all. They were signed on December 3, 2015. *See, e.g.*, JX 1 at -1101. They make no mention of Wallace as seller. They expressly indicate that "no consideration was paid by [Ci Ci] for such conveyance." *Id.* at -1096. I do not rely on the trust instruments as the contracts by which Wallace sold the Initial Properties to Li or Ci Ci.

[74] *E.g.*, JX 1 at -1096.

[75] *See*, *e.g.*, *id.* at -1097 § 5.c.

[76] JX 4 at -0486 § 7.

[77] Am. Compl. ¶ 21 (taking the position that her family attempted to postpone closing a few times).

respond to Wallace for two weeks.[78]  Wallace "start[ed] getting worried" and reached out to Ci Ci, who helped reinitiate communication between Li and Wallace.[79]  The Lis had changed their minds on purchasing Peoples Way, and Wallace and Li fell out.[80]  Wallace retained roughly $300,000 the Li family had wired him.[81]

### E.    Ci Ci Forms New Start; Wallace Reengages; Li Forms Double Forest.

In May of 2016, with Wallace and Li at odds, Ci Ci formed New Start.[82] Neither Wallace nor his associates participated.[83]  Ci Ci met with an attorney on her

---

Ci Ci tried to take sole ownership of the decision not to purchase Peoples Way, telling a tale that it was going to be her primary residence but that she decided it was too large for her.  Tr. (Ci Ci) at 177.  This was not credible.  *See supra* note 16.  The preponderance of the credible evidence shows the decisionmaker was Li, or at most Ci Ci's family.  Tr. (Ci Ci) at 21; *id.* at 177–78; PostTB at 4.

[78] Tr. (Wallace) at 136.

[79] *Id.*

[80] *Id.* (Ci Ci) at 21, 177.

[81] *Id.* at 85, 263.

[82] JX 5 at -0946.

[83] Tr. (Ci Ci) at 176, 190–91.

own and transferred the Initial Properties held in the four trusts to New Start.[84] This transfer effectively eliminated Siew and Wallace's authority over those properties.[85]

In September of 2016, Ci Ci's parents returned to the United States.[86] They visited Wallace's house and the families had an extended conversation regarding the fallout.[87] Ci Ci facilitated the conversation, insisting the pair could "fix the mistakes" and "still move forward together."[88] Wallace was "upset for what [Li] did to [him]," and Wallace informed Li that "if [Li] want[ed] to continue to play games like that, being dishonest," then Wallace would rather take the matter to court.[89] This comment upset Li, and the meeting ended without any resolution.[90]

A few days later, Li again approached Wallace and "brought up the idea of continu[ing] to work" together.[91] Li promised "to buy properties from [Wallace]," to keep his word.[92] Wallace and Li reconciled and resumed their joint enterprise.

---

[84] *Id.* (Ci Ci) at 176, 190–91.

[85] *See*, *e.g.*, JX 1 at -1096 § 5.

[86] *Id.* (Ci Ci) at 51–52.

[87] *Id.* (Wallace) at 137–38.

[88] *Id.* (Wallace) at 141.

[89] *Id.* (Wallace) at 137.

[90] *Id.* (Wallace) at 137–38.

[91] *Id.* (Wallace) at 138.

[92] *Id.*

Wallace helped Li form and incorporate Double Forest to assume Li's obligations in the enterprise.[93] The company's name was meant to signify Li's collaboration with Wallace.[94] On September 26, Wallace spent an entire day, from morning until 10:00 p.m., meeting with Li and accompanying him to the meetings necessary for creating Double Forest.[95] Ci Ci had no part in these meetings or in Double Forest's incorporation.[96] Double Forest was established with Li as the sole stockholder.[97] Instead of Wallace and Li sharing profits, Wallace would share them with Double Forest.[98] Wallace and Li handwrote their plan to continue working together in Chinese in Li's notebook.[99] Ci Ci urged modifications to the Wallace-Li agreement to split the profits equally between them, rather than Li receiving sixty percent and Wallace receiving forty.[100] At some point and without Wallace's knowledge, Li transferred ownership of Double Forest to Ci Ci.[101]

---

[93] *Id.* at 104–105, 151; JX 6.

[94] Tr. (Wallace) at 151.

[95] *Id.* (Wallace) at 104–05; JX 6.

[96] Tr. (Wallace) at 104.

[97] *Id.* at 103–104.

[98] *Id.* (Wallace) at 242.

[99] Countercl. ¶ 5; Tr. (Wallace) at 141, 242.

[100] Tr. (Wallace) at 242.

[101] *See*, *e.g.*, *id.* (Wallace) at 151; JX 14 at -1952.

## F. The Wallace-Li Enterprise Restarts.

The Wallace-Li enterprise restarted just as it had begun, with two arms: Wallace offered to sell more rental properties to the Li family and pay rental income to Ci Ci, while Wallace and Li pursued another high-priced home to resell.

For the first prong, Li and Wallace agreed that the $300,000 Wallace had retained from the failed Peoples Way transaction would be applied to Ci Ci's acquisition of three rental properties Wallace owned: 13 9th Avenue ("9th Avenue"), 22 6th Avenue ("6th Avenue"), and 804 Marshall Street ("Marshall Street").[102] New Start would be the buyer.[103]

On October 24, Wallace drafted an agreement for each rental property, signed all three, and emailed them to Li and Ci Ci.[104] Each agreement identifies New Start as the buyer, and does not include an "and/or assigns" clause.[105] 9th Avenue was priced at $120,000; 6th Avenue at $110,000; and Marshall Street at $100,000.[106] The agreements contain language providing "time is of the essence" and establish final settlement shall be held "within 30 days of acceptance, or before if mutually agreed upon," or "a reasonable time" after to provide time for "secur[ing] a survey,

---

[102] *See*, *e.g.*, JX 7 at -1563, -1581, -1599; Tr. (Ci Ci) at 23, 85.

[103] JX 7 at -1563 § 1, -1581 § 1, -1599 § 1.

[104] *Id.* at -1562.

[105] *See*, *e.g.*, *id.* at -1563.

[106] *See*, *e.g.*, *id.* at -1563 § 3, -1581 § 3, -1599 § 3.

19

or prepar[ing] . . . legal and financial settlement documents."[107] In addition, all three agreements repeated the Initial Properties' terms benefitting Ci Ci: Wallace agreed to pay Ci Ci rent on each property if it was ever unoccupied, to pay for any repairs or maintenance, and to serve as its property manager at no cost to Ci Ci.[108] Each contract specifies these additional terms and conditions would continue until (1) October 31, 2019 or (2) the property was sold to another party and Wallace was released from management, whichever happened first.[109]

Ci Ci never signed any of these agreements.[110] The parties never went to closing. But by November 2016, Wallace was paying Ci Ci the rent on those three

---

[107] *Id.* at -1565 §§ 7–8, -1583 §§ 7–8, -1601 §§ 7–8.

[108] *Id.* at -1570 § 32, -1588 § 32, -1606 § 32; *see* Tr. (Wallace) at 245, 327.

[109] JX 7 at -1570, -1588, -1606 (stating under "Additional Terms and Conditions" that "Seller agrees to be responcible [sic] for all maintenance and repair costs as well as the reimbursement of all rents when the current tenants do not pay as long as the property stays under the sellers [sic] property management. All terms and conditions are effective until October 31, 2019.").

[110] Ci Ci's effort to create credible evidence that she signed them failed. She produced agreements bearing her signature for 6th Avenue and Marshall Street. JX 11; JX 12. Wallace had not seen these agreements countersigned before this lawsuit. Tr. (Wallace) at 311, 324.

Ci Ci did not produce an executed agreement for 9th Avenue. *See* JX 7 at -1563–1580 (9th Avenue agreement signed by Wallace but not by New Start). As it turned out, Wallace sold 9th Avenue to Ci Ci's friend in March 2017, via an agreement between Wallace as seller and Ci Ci's friend as buyer. JX 18 at -2072, -2090. Wallace could not have sold 9th Avenue in 2017 if he had sold it to New Start in 2016. Perhaps this is why Ci Ci did not produce an agreement by which New Start purchased 9th Avenue.

Ci Ci also failed to consistently testify about the circumstances in which she delivered executed copies of these agreements to Wallace. Ci Ci testified she signed the

20

properties anyway, to keep his promises to Li and keep the wholesaling enterprise going.[111]  Wallace testified that while Ci Ci had not executed the agreements, "[he] always believed what Mr. Li [said].  [And Li] said that this time he [was] going to do everything right."[112]  Wallace believed they were "going to have a real[ly] successful business [and] . . . split profits 50/50."[113]

Li reengaged Wallace in purchasing a large residential property.  Wallace and Li pursued a large estate from a third party at 32 and 34 Darien Road ("Darien Road").[114]  At the time, Wallace understood from Li that Darien Road would be purchased to replace Peoples Way,[115] and would be "used to court prospective buyers."[116]

---

three agreements on October 30, 2016, and hand-delivered them to Wallace that day.  Tr. (Ci Ci) at 175.  She contradicted herself as to whether she scanned and emailed the three agreements in addition to hand-delivering them:  in her morning testimony, she said she had scanned and emailed them, and by the afternoon she was adamant she had not. *Compare id.* (Ci Ci) at 29–30, *with id.* (Ci Ci) at 174–175, *and id.* (Ci Ci) at 192; *see also id.* (Ci Ci) at 183–84 (acknowledging she did not give her lawyer the emails by which she allegedly transmitted the scanned signed copies of the disputed agreements to Wallace).

I conclude New Start did not sign the agreements in 2016, and that JX 11 and JX 12 are backdated and created for this litigation.

[111] *See*, *e.g.*, Tr. (Wallace) at 238–39; *id.* (Ci Ci) at 32.

[112] *Id.* (Wallace) at 262.

[113] *Id.*

[114] *Id.* (Ci Ci) at 54; D.I. 79, Ex. A at 86:6–23.

[115] Tr. (Wallace) at 308 (explaining they purchased "Darien Road instead of Peoples Way").

[116] Countercl. ¶ 7; D.I. 79, Ex. A at 86:6–23 (discussing during deposition the initial plan as articulated by Li for Darien Road).

21

Wallace understood Li was effectively the buyer of Darien Road.[117] At some point, Li chose Double Forest to be the buyer.[118] Wallace served as Double Forest's realtor.[119] While Ci Ci insists she was the buyer and driver for the Darien Road transaction,[120] the record shows she acted on Li's behalf.[121]

Double Forest agreed to purchase Darien Road for $604,071.03.[122] Li borrowed around $250,000 from Wallace for the purchase and repaid him just before closing.[123] On February 16, 2017, Double Forest closed on Darien Road, with

[117] Tr. (Wallace) at 256 ("Li just put up the money and g[a]ve [Wallace] and Ci Ci instructions on what to do. [Wallace] and Ci Ci [would] just go execute it. [They'd] just go follow his instruction.").

[118] *See* JX 14 at -1953; JX 15 at -0215.

[119] Tr. (Wallace) at 100 (declaring to Ci Ci that for Darien Road, "your father told me to be his realtor, and I did. I did it for your father."); *id.* (Wallace) at 223.

[120] *See, e.g.*, *id.* (Plaintiffs' Counsel and Ci Ci) at 54 ("'And who helped you buy the 34-34 Darien Road Property?' '[Wallace] . . . he was my realtor.'"); *id.* (Ci Ci) at 186 ("I need[ed] to close my primary residence, 34-32 Darien Road.").

[121] As the mechanics for the Darien Road purchase unfolded, the buyer needed to complete certain paperwork. JX 14 at -1954. But Wallace explained on the buyer's behalf that this was not possible because the buyer was in China and unable to sign or send documents. JX 14 at -1954. At this point, Li decided Double Forest would purchase Darien Road. JX 14 at -1953. Ci Ci was included on this email exchange and participated in it, offering to sign certain documents. JX 14 at -1952. By Ci Ci's availability to sign and send documents, contrasted to the buyer's purported inability to sign and send documents, I conclude Li was the buyer and Ci Ci merely assisted him.

[122] JX 15 at -0215; JX 14 at -1952–1956 (identifying the buyer as Double Forest in January 2017); Plaintiffs have not produced the Darien Road purchase agreement.

[123] Tr. (Wallace) at 264 (indicating Li asked to borrow money from Wallace for purchasing the Darien Road Property).

22

Double Forest listed as the borrower on the settlement statement.[124]  Thereafter, Wallace and Li would use Darien Road to "court prospective property purchasers."[125]

### G.    Li Demands More For Ci Ci.

Wallace did not know Li also intended Darien Road to benefit Ci Ci.  Wallace later discovered Li intended it to be Ci Ci's primary residence.[126]  Ci Ci testified she understood Darien Road was bought for her and that she currently resides there.[127]

Around this time, Ci Ci was in her last semester before graduation and asked Wallace to train and mentor her in the residential real estate business.[128]  The two met frequently, and Wallace shared everything he knew.[129]  While Ci Ci was learning the ropes from Wallace, she identified a friend as a buyer for Wallace's 9th Avenue property—which Wallace had not yet sold to New Start.[130]  Again, against Wallace's preference of holding rather than selling, Li instructed Wallace to sell 9th Avenue to

---

[124] JX 15 at -0215.

[125] Countercl. ¶ 8; D.I. 79, Ex. A at 86:6–16 (indicating "Li claimed that he will buy [Darien Road] . . . so that he can bring clients from China to live in" and that Wallace later "found out . . . it was just a house for [Ci Ci] to live in.  It wasn't, like her dad said, to use for business purposes.").

[126] Countercl. ¶¶ 7–8; D.I. 79 at 86:6–16.

[127] *See, e.g.*, Tr. (Ci Ci) at 174.

[128] *Id.* (Wallace) at 257; *id.* (Ci Ci) at 90.

[129] *Id.* (Wallace) at 257.

[130] *Id.* (Ci Ci) at 183.

Ci Ci's friend.[131] In March, Wallace and Ci Ci's friend entered an agreement of sale for $150,000.[132]

Li wanted "to encourage and motivate [his] daughter" as she neared attaining her real estate license.[133] She had located a buyer for 9th Avenue, and the transaction had closed; Ci Ci was expecting some recognition.[134] At Li's direction, Wallace emailed Ci Ci on March 13, congratulating her on closing her first deal.[135] Li went further: he instructed Wallace to give the $150,000 purchase price to Ci Ci, promising to repay Wallace his share the next time Li was in the United States.[136] "On May 5, 2017, after receiving the sale proceeds directly to his personal bank account, Wallace transferred the entirety of the purchase price, $150,000.00, to [Ci Ci]."[137] Wallace had no legal obligation to pay Ci Ci; she knew he "voluntarily" wrote her the check.[138] While knowing the money came from his "pocket," she happily accepted it without any question or surprise.[139]

---

[131] *Id.* (Wallace) at 238, 145, 251.

[132] JX 18 at -2073; JX 20.

[133] Tr. (Wallace) at 145.

[134] *Id.* (Ci Ci) at 91–93.

[135] JX 18 at -2072; Tr. (Wallace) at 328–29.

[136] *See, e.g.*, *id.* (Wallace) at 249, 322.

[137] PTO ¶ 26.

[138] Tr. (Ci Ci) at 50.

[139] *Id.* (Ci Ci) at 91–93.

Wallace still owned 6th Avenue and Marshall Street (the "Disputed Properties"), but he was sending Ci Ci all their rental income. In the summer of 2017, Ci Ci identified another buyer for 6th Avenue.[140] Her cousin Yuci Wang was interested in purchasing 6th Avenue, and Ci Ci was interested in receiving the proceeds from that sale as well.[141] Wallace owned 6th Avenue, and Wallace had not yet agreed to sell it to Wang. Wang paid the Li family $160,000 for 6th Avenue in June.[142] In August, Wang visited the United States with Ci Ci's parents and viewed the property.[143] On August 15, 2017, Wallace and Wang entered an agreement of sale for 6th Avenue, to close within thirty days.[144] Wallace and Wang agreed to extend closing until November 30.[145] Wallace's agreement with Wang makes no reference to any agreement between Wallace and New Start.[146]

---

[140] *Id.* (Ci Ci) at 188; JX 23 at -0360.

[141] Tr. (Ci Ci) at 188.

[142] Am. Compl. ¶ 49; JX 23; JX 31 at -0871 ("NOW THEREFORE, in exchange for the sum of ONE HUNDRED SIXTY THOUSAND DOLLARS ($160,000.00) already delivered to 22 6th Series and other good and valuable consideration, the parties agree as follows: Wang hereby agrees to purchase the Property . . . .").

[143] Tr. (Ci Ci) at 188; JX 23 at -0360.

[144] JX 23 at -0354, -0360.

[145] *See* JX 24.

[146] *See* JX 23.

## H.    Wallace Walks Away.

Sometime before September 15, before 6th Avenue's closing date, Wallace walked away from his venture with Li.  Wallace and his ex-wife met with Ci Ci, her parents, and Wang at Darien Road.[147]  Wallace and Li had a lengthy private discussion.[148]  Wallace had performed all his promises to Li; but Li had not fulfilled one to Wallace, and Wallace was losing money.[149]  Li asked Wallace to have patience with him, and recommitted to his promise to buy ten properties from Wallace.[150]

Wallace agreed to move forward with the enterprise again, but he wanted to be repaid his share of the 9th Avenue proceeds.[151]  Li was incredulous.  He emphasized the opportunity he had given Wallace to do business with him, and expressed his business prowess over Wallace's.[152]  Li declared that his promise to repay Wallace's share from 9th Avenue was never reduced to writing, and that as far

---

[147] Tr. (Wallace) at 142–47.

[148] *Id.*

[149] *Id.* (Wallace) at 327 ("[O]ver the years, I've put up all my money for the repairs, for the rents, even though the properties was vacant.  I was already in the negatives.").

[150] *Id.* (Wallace) at 144.

[151] *Id.* (Wallace) at 144–45, 247; JX 7 at -1563 § 3; JX 18 at -2073.

[152] Tr. (Wallace) at 145–46.

26

as he or Ci Ci were concerned, they did not owe Wallace anything.[153] Li denied all promises he had made to Wallace.[154]

This confrontation was the final straw for Wallace, and it ended the relationship.[155] Wallace promptly blocked Ci Ci and her parents from all means of communicating with him.[156] That night was the last time Wallace met with Ci Ci or her parents until this litigation.[157]

## I. Wang's 6th Avenue Purchase Fails To Close.

6th Avenue was never transferred from Wallace to Wang.[158] By October, Wang had returned to China.[159] The settlement attorney tried for months to accomplish closing, with Ci Ci speaking for Wang and Siew speaking for Wallace. Ci Ci separately tried to reach Wallace in furtherance of keeping Wang's $160,000 payment.[160] Ci Ci expected Wallace to pay her that entire purchase amount.[161] But Wallace was finished with Li and Ci Ci, and never responded to her.

---

[153] *Id.* (Wallace) at 146.

[154] *Id.* (Wallace) at 145–47, 323–24.

[155] *Id.* (Wallace) at 144–47, 323–24.

[156] *Id.* (Wallace) at 150–51, 250.

[157] *Id.* (Wallace) at 143–44, 323.

[158] *Id*. (Wallace) at 327–29.

[159] JX 25 at -0458 (indicating Wang was in China by October 13, 2017).

[160] Tr. (Ci Ci) at 68, 142–43 (indicating Ci Ci continued trying to reach Li in order to purchase 6th Avenue but that he never responded).

[161] *Id.* (Ci Ci) at 188.

And so Ci Ci became nonresponsive and uncooperative in the settlement process, failing to provide the settlement attorney with the documents required from Wang and pushing out the settlement date.[162] A final December settlement date passed without the deal closing.[163] Wallace never received Wang's funds that Ci Ci held.[164]

### J. Wallace Moves On; Ci Ci Moves On The Attack.

Wallace moved on. By December, Wallace stopped sending rent payments to Ci Ci for 9th Avenue and Marshall Street.[165] His participation in the Li venture was over.

But Ci Ci was not done with Wallace—she would continue to pursue revenue from Wallace's properties. In November 2017, Ci Ci had obtained her real estate license, which she used to keep tabs on Wallace's properties.[166] In February 2018, Wallace retained Delaware Premier Property Management, LLC ("DPPM") to manage his rental properties.[167] Ci Ci contacted DPPM just one month later for

---

[162] JX 25 at -0458; JX 26 at -2169–71; JX 27 at -0467–68.

Ci Ci testified the settlement fell through because Wallace was nonresponsive. Tr. (Ci Ci) at 67–69. The overwhelming balance of the evidence shows the settlement fell through because of Ci Ci's inability or refusal to supply what was required from Wang.

[163] JX 27 at -0470–71.

[164] *See* Am. Compl. ¶¶ 49, 51; JX 31 at -0871.

[165] PTO ¶ 30(xiv).

[166] Tr. (Ci Ci) at 26, 178–79.

[167] JX 28 at -2338.

information about the Disputed Properties.[168]  She introduced herself as Wallace's friend and as the owner of the Initial Properties and the Disputed Properties.[169]  Ci Ci expressed to DPPM that Wallace had "told [her] . . . he [now] let[s] [DPPM] manage all the properties."[170]  But Wallace had not communicated with Ci Ci for roughly a year.[171]  Ci Ci then asked DPPM for an update on all rental payments; DPPM gave her one and told her that the February rent had been mailed out.[172]

In April, Ci Ci e-mailed DPPM again, asking about the Disputed Properties' rental payments and expressing she had not been paid.[173]  On April 18, DPPM responded tersely, informing Ci Ci that the public records reflected Wallace owned the two properties, and that DPPM had contacted Wallace about Ci Ci.[174]  On April 20, Ci Ci replied with a lengthy defense of her position and a proactive attack on Wallace, declaring she would be suing Wallace for breach of contract, and asking

---

[168] *Id.*

[169] *Id.*

[170] *Id.*

[171] Wallace did not tell Ci Ci DPPM was managing his properties.  *See* Tr. (Ci Ci) at 69, 134–35.

[172] JX 28 at -2338.

[173] JX 29 at -2362.

[174] *Id.* at -2361.

DPPM not to send him any rent payments.[175]  DPPM did not respond.  Wallace was now aware Ci Ci was planning a lawsuit against him.

On August 25, 2018, Wallace took out a $100,000 mortgage on Marshall Street.[176]  It was recorded on September 14, and Ci Ci discovered the mortgage while tracking the property on the Multiple Listing Service (the "MLS").[177]

Wallace consulted his friend and fellow real estate investor, Jason Williams, about Ci Ci's threat of litigation.[178]  Williams recommended Wallace put all his properties in a trust to protect them and offered to do it for him.[179]  Williams prepared the trusts and deeds.[180]  On February 7, 2019, Wallace transferred each Disputed Property to a trust, with Daniels as trustee.[181]  Williams notarized Wallace's signature on February 7, 2019.[182]  Wallace testified he formed the trusts for "privacy" and protective purposes.[183]  Wallace did not record the deeds until

---

[175] *Id.*

[176] JX 30 at -0722.

[177] *Id.*; Tr. (Ci Ci) at 81, 178–79.

[178] *Id.* (Wallace) at 270; *id.* (Daniels) at 213.

[179] *Id.* (Wallace) at 270; *id.* (Daniels) at 213.

[180] *Id.* (Wallace) at 268.

[181] JX 33 at -0586; JX 34 at -0582.

[182] JX 33 at -0589; JX 34 at -0585.

[183] Tr. (Wallace) at 268.

30

February 5, 2020; Ci Ci was only able to observe this transaction on the MLS after that date.[184]

### K.    Ci Ci Agrees To Sell 6th Avenue To Wang.

Ci Ci and Wang still had unfinished business; Ci Ci had not returned Wang's $160,000 payment for 6th Avenue.  On May 30, 2019, Ci Ci entered an agreement to sell 6th Avenue to Wang once New Start acquired it from Wallace.[185]  That agreement provides that "Wallace did not have the power to assign the [f]irst

---

[184] *Id.* (Daniels and Plaintiffs' counsel) at 213; *id.* (Ci Ci) at 66.

Plaintiffs argue that the discrepancy between the February 2019 signature and February 2020 recording date indicates Wallace backdated the signatures and actually moved each Disputed Property into a trust after this litigation was filed; Plaintiffs' post-trial brief declares Wallace admitted to backdating the deeds.  PostTB at 14.  I do not find either backdating or any admission of backdating to be supported by a preponderance of the evidence.  Beginning with the admission:  counsel did not ask Wallace if he backdated the signature to the deeds, or why there was a discrepancy with the dates, but rather only asked if "it was done after this lawsuit was filed." Tr. (Plaintiffs' counsel) at 269.  Wallace was credibly confused by opposing counsel's insinuation that the delay in recording was "dishonest." *Id.* (Wallace) at 274–75.

While Wallace recorded the deeds after the lawsuit was filed, there is no basis to conclude he backdated the signature.  Williams was not called as a witness.  By February of 2018, Wallace knew Ci Ci was keeping tabs on his properties.  JX 29 at -2362.  Wallace also knew Ci Ci was threatening litigation as early as April 20, 2018.  *Id.* at -2361.  Wallace explained he transferred the properties to a trust for "privacy purposes." Tr. (Wallace) at 268.  Daniels testified he had "no clue" about the timing of the transfer and the recording of it.  *Id.* (Daniels) at 213–14.  All Daniels could contribute was that Wallace approached him asking for assistance, "wanting to transfer a couple properties" to Daniels in his name, and Daniels "was just aware of helping him as a friend, as a favor." *Id.* (Daniels) at 210–11. I found Daniels to be a forthright witness whose goal at trial was to testify honestly about his limited role as trustee.  It is more likely than not that Wallace moved the properties into trusts in 2019, but withheld recording the deeds to maintain his privacy.

[185] JX 31 at -0871.

[p]urchase [a]greement" to Wang, and that that agreement was "the only legal document for the future right to purchase the property."[186] Because Ci Ci did not own 6th Avenue, she could not supply the property to Wang.

### L. Ci Ci Files This Action.

On October 17, 2019, Ci Ci and New Start filed this action, seeking to force Wallace to convey the Disputed Properties to New Start.[187] She produced executed agreements between New Start and Wallace for the Disputed Properties, dated October 30, 2016. She argues these agreements give her the right to close on the Disputed Properties any time until October 31, 2019.[188] I have concluded Ci Ci did not sign those agreements in October 2016 and backdated them for purposes of this litigation.[189]

Wallace filed a pro se answer on December 6, 2019, and explained his side of the story: he contended the agreements for the Disputed Properties had never been countersigned until this litigation; asked for his "pay back for all the repairs, the monthly rents, even the big damages your tenants created after eviction that [Li] asked us to put up with our company money to fix and [n]ever pay us back;"

---

[186] *Id.* § 2. Wang's agreement with Ci Ci incorrectly characterizes Wang's 2017 purchase agreement with Wallace as an assignment. *Id.*; *see also* JX 7 at -1581–1598.

[187] *See* D.I. 1.

[188] *See* JX 11 at -0843 § 32, -0851; JX 12 at -0861 § 32, -0868.

[189] *See supra* note 110.

explained he never received any of the profits from 9th Avenue; took umbrage at Li walking away from the Peoples Way transaction; and contended Li never performed his commitment to buy properties from Wallace.[190]

Wallace retained counsel and moved to dismiss, declaring his pro se answer a "nullity."[191] I concluded Wallace's pro se filing should be treated as a statement under oath, but not an answer that precluded moving to dismiss.[192] I also converted Wallace's motion to one for summary judgment.[193] And I encouraged the parties to consider mediation.[194]

Because Plaintiffs' original complaint sought specific performance from Wallace, not the trusts holding the properties, Plaintiffs filed an amended complaint on May 4, 2021, against Wallace and Daniels as trustee of the Disputed Properties' trusts (together the "Defendants").[195] Plaintiffs' amended complaint alleges Wallace refused to close on the Disputed Properties and to give her the rental income in the meantime, and Daniels participated in a scheme that interfered with her contractual rights.[196] Plaintiffs seek declaratory judgments confirming the agreements of sale

---

[190] D.I. 4.

[191] D.I. 21 at Brief 2.

[192] D.I. 28 at 4, 13.

[193] *Id.* at 5.

[194] *Id.* at 18–19.

[195] *See* D.I. 29.

[196] Am. Compl. ¶¶ 75–99.

concerning the Disputed Properties (the "Disputed Agreements") are valid and binding contracts, and they seek specific performance, including conveyance of title and satisfaction of past-due rental payments for the two properties.[197]

On September 27, 2021, Defendants filed their answer, raising eleven affirmative defenses.[198] Among their several affirmative defenses, Defendants contend "Plaintiffs have engaged in inequitable conduct, and their claims are barred under the doctrine of [u]nclean [h]ands."[199] Defendants also filed a verified counterclaim and third-party complaint, asserting four counterclaims and one alternative claim against New Start, Ci Ci, and Double Forest as a third-party defendant.[200] Wallace and Daniels assert (1) a partnership existed between Wallace and Double Forest; (2) Double Forest owed duties of loyalty to Wallace and breached them by refusing to share profits; (3) the partnership requires judicial dissolution and judicial supervision in its winding-up; (4) the agreements Plaintiffs seek to enforce are invalid; and (5) without valid agreements, there is no justification for Plaintiffs' retention of the rents paid by Wallace, so the counterclaim defendants

---

[197] *Id.* at 24–25; PTO ¶ 1.

[198] Defs. Ans. at 36–37.

[199] *Id.* at 37.

[200] Countercl. ¶¶ 33–73.

were unjustly enriched.[201]  Wallace and Daniels seek declaratory judgments, judicial dissolution of the partnership, damages for Plaintiffs' unjust enrichment, and feeshifting.[202]

Trial was held on February 5 through February 6, 2024.[203]  On March 7, Plaintiffs informed the Court that Defendants did not intend to participate in the post-trial briefing.[204]  On April 5, Plaintiffs submitted their post-trial opening brief.[205]  I took the matter under advisement on April 8.[206]

---

[201] *Id.*  Wallace and Daniels also pled a sixth claim in the alternative.  But, because judgment is entered in favor of counts IV and V, I do not reach count VI.

[202] *Id.* at 50–51.

[203] D.I. 82.

[204] D.I. 87 at Ltr.

[205] D.I. 89.

[206] D.I. 92.

## II. ANALYSIS

Plaintiffs' claims are barred by this Court's defense of unclean hands. As to Defendants in their posture as counterclaim plaintiffs, I decline Plaintiffs' request to apply unclean hands to bar Defendants' claims for relief. Defendants thus bear the "burden of proving their respective claims by a preponderance of the evidence."[207] Defendants failed to meet their burden in proving the Wallace-Li enterprise constituted a partnership, so judgment is entered for Third Party Defendant as to Defendants' counts I, II, and III. But, no enforceable agreement of sale exists between Wallace and New Start for the Disputed Properties, so I enter judgment in favor of Defendants on their count IV. And I find Plaintiffs have been unjustly enriched and thus find in favor of Defendants on count V. Defendants are entitled to restitution and an award shifting their fees and costs incurred in this litigation.

### A. Plaintiffs' Claims Are Barred By Their Unclean Hands.

"The guiding doctrine in this case is the equitable maxim that 'he who comes into equity must come with clean hands.'"[208] "The doctrine of unclean hands provides that a litigant who engages in reprehensible conduct in relation to the matter in controversy forfeits his right to have the court hear his claim, regardless of its

---

[207] *Lynch*, 2020 WL 4381604, at *30.

[208] *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945).

merit."[209] "The Court invokes the doctrine when faced with a litigant whose acts threaten to tarnish the Court's good name. In effect, the Court refuses to consider requests for equitable relief in circumstances where the litigant's own acts offend the very sense of equity to which he appeals."[210] My analysis of Plaintiffs' claims is precluded by their conduct in this litigation. [211]

Defendants invoked the doctrine of unclean hands as an affirmative defense.[212] This Court also has the inherent discretion to refuse to assist an unclean litigant.[213] The doctrine "is designed primarily to protect courts of equity from being misused by a party who has not acted fairly and without fraud or deceit as to the controversy in issue."[214] Thus, "to the extent it is a defense, it is a defense belonging,

---

[209] *Am. Healthcare Admin. Servs., Inc. v. Aizen*, 285 A.3d 461, 494 (Del. Ch. 2022) (emphasis omitted) (quoting *Portnoy v. Cryo-Cell Int'l, Inc.*, 940 A.2d 43, 81 (Del. Ch. 2008)).

[210] *Nakahara v. NS 1991 Am. Tr.*, 718 A.2d 518, 522 (Del. Ch. 1998).

[211] *Gallagher v. Holcomb & Salter*, 1991 WL 158969, at *4 (Del. Ch. Aug. 16, 1991) ("[The doctrine of unclean hands] is a rule of public policy to protect the public and the court against misuse by persons who, because of their conduct, have forfeited the right to have their claims considered." (citing *Skoglund v. Ormand Indus., Inc.*, 372 A.2d 204, 213 (Del. Ch. 1976))), *aff'd sub nom. New Castle Ins., Ltd. v. Gallagher*, 692 A.2d 414 (Del. 1997) (TABLE).

[212] Defs. Ans. at 37.

[213] *Bodley v. Jones*, 59 A.2d 463, at 492–93 (Del. 1947) ("The Court is so jealous in guarding itself against such misuse that it will sua sponte apply the maxim whenever it discovers the unconscionable conduct."); *Precision Instrument Mfg.*, 324 U.S. at 815 (acknowledging a wide range to the equity court's use of discretion in refusing to aid the unclean litigant); *Patel v. Dimple*, 2007 WL 2353155, at *12 (Del. Ch. Aug. 16, 2007) (applying the doctrine of unclean hands despite the defendant's failure to raise it).

[214] *Patel*, 2007 WL 2353155, at *12.

37

not to any defendant, but to the court of equity itself."[215]  This Court refuses to reward plaintiffs who are dishonest in their approach to this Court.[216]  "While extensive, the discretion of the Court is by no means absolute,"[217] and whether the doctrine applies to bar a litigant's claims is a gating inquiry.[218]  "Doctrinally there are a number of limitations on the application of the maxim."[219]

First, it is an "equitable doctrine,"[220] and so a court must look to the relief sought to determine whether its equitable powers have been invoked.[221]  The doctrine is generally unavailable for defeating legal claims, but when a litigant "invoke[s] the [C]ourt's equitable powers," she opens the door to an application of unclean hands, even if the relief sought is not purely equitable.[222]

---

[215] *In re Niki and Darren Irrevocable Tr.*, 2020 WL 8421676, at *5 (Del. Ch. Feb. 4, 2020).

[216] *See Lynch*, 2020 WL 4381604, at *46–47, *49 (applying unclean hands where plaintiff fraudulently induced defendant to execute sham documents and presented those sham documents to justify the relief he sought); *see also In re Silver Leaf, L.L.C.*, 2005 WL 2045641, at *12–13 (Del. Ch. Aug. 18, 2005) (applying unclean hands where the parties premised their entire argument on a lie).

[217] *Nakahara*, 718 A.2d at 522–23 ("[T]he decisional authority is almost universal in its acceptance that courts of equity have extraordinarily broad discretion in application of the doctrine.").

[218] *Aizen*, 285 A.3d at 485.

[219] *Nakahara*, 718 A.2d at 523.

[220] *Gallagher*, 1991 WL 158969, at *4.

[221] *Aizen*, 285 A.3d at 493 ("[A] defense of unclean hands is generally unavailable to defeat a legal claim, but becomes available if the plaintiff seeks equitable relief.").

[222] *Id.* (acknowledging the plaintiffs sought both legal and equitable relief, and holding they opened the door to an assertion of unclean hands when they sought specific performance); *Nakahara*, 718 A.2d at 522 ("[T]he Court refuses to consider requests for equitable relief

Second, "the inequitable conduct must have an 'immediate and necessary' relation to the claims under which relief is sought."[223] It does not apply to "all 'sinners' and does not comprehend all 'moral infirmities.'"[224] The equity-seeking litigant does not "have [to] le[a]d [a] blameless li[fe],' as to other matters[;] it require[s] that [the litigant] shall have acted fairly and without fraud or deceit as to the controversy in issue."[225] It must "be directed at, or be the concern of, an interested party (as opposed to any third party)."[226] At the same time, the inequitable conduct does not need to be "of such a nature as to be punishable as a crime or as to justify [any] legal proceedings . . . . Any willful act concerning the cause of action which . . . transgress[es] equitable standards of conduct is sufficient cause for the invocation of the maxim."[227]

Finally, application of the doctrine is limited by equity itself. "[T]he greatest limitation on the doctrine is the widely accepted exception that since [the doctrine] is ultimately based on public policy . . . a stronger public policy may be at work

---

in circumstances where the litigant's own acts offend the very sense of equity to which he appeals.").

[223] *Nakahara*, 718 A.2d at 523 (quoting *Kousi*, 1991 WL 248408, at *3).

[224] *Aizen*, 285 A.3d at 485 (quoting 27A Am. Jur. 2d Equity § 21 (footnotes omitted), Westlaw (database updated Nov. 2022)).

[225] *Precision Instrument Mfg.*, 324 U.S. at 814–15 (quoting *Keystone Driller Co.*, 290 U.S. at 247).

[226] *Nakahara*, 718 A.2d at 523.

[227] *Precision Instrument Mfg.*, 324 U.S. at 815.

giving the unclean litigant fortuitous reprieve from the doctrine's otherwise potentially preclusive effect."[228] "This court has consistently refused to apply the doctrine of unclean hands to bar an otherwise valid claim of relief where the doctrine would work an inequitable result."[229]

Plaintiffs have invoked this Court's equitable powers by seeking specific performance under the Disputed Agreements.[230] "[They] are not solely seeking legal relief in the form of money damages or a declaratory judgment."[231] Plaintiffs have opened the door for the doctrine's application to their legal and equitable claims.[232]

Plaintiffs have acted inequitably, and the inequitable conduct is immediately and necessarily related to the claims under which relief is sought. Plaintiffs came to this Court seeking specific performance of Wallace's purported agreements to sell 6th Avenue and Marshall Street to New Start, in a vacuum and at arm's length. By Ci Ci's telling, she was naively starting out in the real estate business;[233] Wallace was her realtor, property manager, and mentor; [234] and she purchased the Initial

---

[228] *Nakahara*, 718 A.2d at 523 (footnote omitted).

[229] *Portnoy*, 940 A.2d at 81 (quoting *Dittrick v. Chalfant*, 2007 WL 1039548, at *5 n.18 (Del. Ch. Apr. 4, 2007)).

[230] Am. Compl. ¶¶ 75–81; PostTB at 15–21.

[231] *Aizen*, 285 A.3d at 493.

[232] *Id.*

[233] Tr. (Ci Ci) at 89–93, 107, 126.

[234] *Id.* (Ci Ci) at 90, 126.

Properties and Disputed Properties from him and accepted the terms he suggested from his position of superior knowledge.[235] By Ci Ci's telling, the transactions between New Start and Wallace were unusual not because they were part of a broader arrangement with Li, but because Wallace was both underhanded and inexplicably foolish at the same time. Ci Ci acknowledged she did not know what kind of seller would agree to Wallace's rental payments and repair obligations, but contends they were Wallace's choice as the drafter,[236] and that his payment to her of $150,000 in 9th Avenue proceeds was voluntary.[237] Ci Ci's story omits Li altogether: she insists that she was Wallace's counterpart and Li was only bankrolling from the sidelines.[238]

Ci Ci's story is premised upon three primary lies: that the Disputed Agreements were executed in 2016, that Wallace was Ci Ci's realtor in those transactions, and that the primary relationship giving rise to the transactions was between Wallace and herself, omitting her father.[239] The preponderance of the evidence indicates Wallace and Li's collaboration gave rise to a series of real estate

---

[235] *Id.* (Ci Ci) at 93, 126.

[236] *Id.* (Ci Ci) at 53; *id.* (Ci Ci and Plaintiffs' counsel) at 149.

[237] *Id.* (Ci Ci and Plaintiffs' counsel) at 50.

[238] *Id.* (Ci Ci) at 8,14, 22–23, 40, 51; Am. Compl. ¶¶ 11, 20.

[239] *See, e.g.*, *id.* (Ci Ci) at 53, 149, 184–85; *see also supra* note 77; *infra note* 256 (indicating Ci Ci's persistent effort to erase her parents' decisional involvement in the transactions).

transactions including the Disputed Properties,[240] Ci Ci was privy to and involved in parts of their work together,[241] and Wallace assumed whichever roles Li dictated, but was only ever a realtor for Darien Road.[242]

In bringing this story to the Court, Ci Ci falsified documents by backdating her signature on the very agreements underpinning her claims.[243] Ci Ci did not countersign the agreements to sell the Disputed Properties at the time; she backdated them for the purpose of asking this Court to enforce them.

Her interactions with this Court were also unclean. She made sworn statements for inclusion in a pretrial order and stipulated facts, then sought to have those statements deemed admitted before the Court. But her sworn statements included lies that: (1) Ci Ci was at all times "the sole officer, director and shareholder of Double Forest"; (2) Wallace served as Ci Ci's realtor for the Peoples Way transaction; (3) Li traveled to the United States for the sole purpose of demanding Wallace return the $300,000; (4) Wallace refused to return the money and frightened Ci Ci, thus coercing her to agree purchase three more properties from him so as not to lose the $300,000; and (5) Ci Ci signed and delivered the agreements

---

[240] *E.g.*, JX 2; JX 7 (indicating Wallace sent agreements for Disputed Properties to Li and Ci Ci); JX 16; Tr. (Wallace) at 238.

[241] JX 7; Tr. (Wallace) at 141, 256.

[242] Tr. (Wallace) at 223–24, 256.

[243] *See supra* note 110.

for the Disputed Properties and 9th Avenue.[244] But in fact, (1) Li was Double Forest's owner until he transferred it to Ci Ci;[245] (2) Wallace was the buyer on behalf of the Wallace-Li enterprise for the Peoples Way transaction;[246] (3) Li travelled to the United States annually, and the summer after Peoples Way fell through met with Wallace to apologize and make amends;[247] (4) Li asked Wallace to resume their joint enterprise, which required Wallace to perform unfavorable obligations to benefit Ci Ci, including offering her three more rental properties;[248] and (5) Ci Ci never signed the agreements to those properties until she produced them for the two Disputed Properties in this litigation.[249] Including these lies in a pretrial order undermined the very purpose of that pretrial order and stipulated facts.[250] Urging the Court to deem

---

[244] *See, e.g.*, PTO ¶¶ 6, 11, 17, 18, 21, 23.

[245] Tr. (Wallace) at 103–04, 151; *see* JX 14 at -1952.

[246] JX 4 at -0484 §1; Tr. (Wallace) at 225–26.

[247] *See* Tr. (Ci Ci) at 7, 51; *id.* (Wallace) at 144 (discussing Wang's visit to the United States with Ci Ci's parents); *id.* (Ci Ci) at 188 (the same); *see id.* (Wallace) at 138.

[248] *Id.* at 137–38, 141, 242; Countercl. ¶ 16.

[249] Ci Ci's testimony about executing the agreements for the Disputed Properties was rife with inconsistency. *Compare* Tr. (Ci Ci) at 29–30, *with id.* (Ci Ci) at 174–175, *and id.* (Ci Ci) at 192.

[250] The pretrial order is meant to be an "efficacious" and "salutary" aid for the Court "toward sifting the issues in order that the suit will go to trial only on questions involving honest disputes of fact or law." *Itron, Inc. v. Consert Inc.*, 109 A.3d 583, at 587 n.3 (Del. Ch. Jan. 15, 2015) (quoting *Fed. Deposit Ins. Corp. v. Glickman*, 450 F.2d 416, 419 (9th Cir. 1971); *Lynch v. Call*, 261 F.2d 130, 132 (10th Cir. 1958)) (collecting cases); *see* 88 C.J.S. Trial § 53, Westlaw (database updated May 2024) (explaining the purpose of a pretrial order and stipulated facts is to "facilitate the correct determination of the

those lies as facts for which no proof would be necessary, due to a lack of participation by a pro se defendant, shocks the conscience.[251]

Ci Ci's lies mounted at trial. She persistently perjured herself on the stand on key precepts of her case: Wallace's status as her realtor,[252] his conveyance of the Initial Properties to her by December trust agreements;[253] her purported hand-delivery of the allegedly countersigned sales agreements for the Disputed Properties;[254] her father's lack of involvement;[255] and her ignorance of Wallace's relationship with her father.[256]

---

issues . . . , promote judicial economy, . . . [and] prevent injustice and a waste of judicial resources . . . .").

    Plaintiffs' application for a pretrial order and to deem the facts admitted was signed and submitted by counsel. D.I. 73 at Ltr.; PTO at 5. Rule 11 provides that "[b]y presenting to the Court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief" that the motion is not being "presented for any improper purpose" and that "the factual contentions have evidentiary support." Ct. Ch. R. 11(b).

[251] D.I. 73 at Ltr.

[252] Tr. (Ci Ci) at 8, 14, 124, 126, 181–82; *see id.* (Wallace) at 99–100, 124, 223–24, 233–24; JX 4 at -0492.

[253] Tr. (Ci Ci) at 10, 13–15.

[254] *Compare id.* (Ci Ci) at 29–30, *with id.* (Ci Ci) at 174–175, *and id.* (Ci Ci) at 192.

[255] *See id.* (Ci Ci) at 177–78 (testifying she, not her father, was the sole decisionmaker in deciding not to close on Peoples Way); *id.* (Ci Ci) at 152 (testifying she had no "previous knowledge or understanding of [Wallace and Li] set[ting] up" Double Forest); *id.* (Ci Ci) at 51 (indicating she changed her mind about purchasing Peoples Way, she only spoke with her father about it to seek his advice, and her parents came to the United States to help her get the money back).

[256] *Id.* (Ci Ci) at 52, 141–42.

Plaintiffs' request for equitable relief from this Court is based on a fictional story and falsified documents. Ci Ci's "entire case was an attempt to hold [Wallace] to sham documents [s]he knew presented lies," and she seeks an undeserved windfall from these documents at Wallace's expense.[257] Plaintiffs have engaged in reprehensible conduct that threatens this Court's integrity and "offend[s] the very sense of equity to which [they] appeal."[258] Their conduct in approaching this Court disqualifies them from seeking relief.

This case presents no countervailing reason not to apply the doctrine of unclean hands. "The public policy against the assertion and enforcement of . . . claims infected with fraud and perjury is too great to be overridden . . . ."[259] And as to whether Ci Ci's conduct disqualifies her from seeking relief, it matters not if Wallace's hands are dirtier, or if they are dirty at all.[260] The application of this

---

[257] *Lynch*, 2020 WL 4381604, at *49; *see also Silver Leaf*, 2005 WL 2045641, at *12–13; *Patel, Inc.*, 2007 WL 2353155, at *13 ("[T]his Court of equity has no proper role in helping [one party] secure an unfair windfall at [the other's] expense.").

[258] *Aizen*, 285 A.3d at 485 (quoting *Merck & Co. v. SmithKline Beecham Pharms. Co.*, 1999 WL 669354, at *45 (Del. Ch. Aug. 5, 1999), *aff'd,* 746 A.2d 277 (Del. 2000) (TABLE).

[259] *Precision Instrument Mfg.*, 324 U.S. at 819.

[260] *Patel*, 2007 WL 2353155, at *12 ("[T]he unclean hands doctrine is not about whose hands are dirtier" because "it is designed primarily to protect courts of equity from being misused by a party who has not acted fairly and without fraud or deceit as to the controversy in issue."); *Gallagher*, 1991 WL 158969, at *4 ("The equitable doctrine of unclean hands is not strictly a defense to which a litigant is legally entitled. Rather, it is a rule of public policy to protect the public and the court against misuse . . . . The question raised by a plea

45

defense is to protect the Court, not Defendants. Plaintiffs forfeited the right to have their claims considered, regardless of their merits. Judgment on Plaintiffs' counts is entered in Defendants' favor.

### B. Defendants' Claims

As a gating matter, Plaintiffs and Double Forest assert the unclean hands doctrine precludes this Court from aiding Defendants. They are incorrect. I then proceed to the merits of Defendants' claims against Plaintiffs and Double Forest, which meet mixed results.

### 1. Unclean Hands

Defendants have not committed misconduct giving rise to unclean hands. Plaintiffs have identified several instances of misconduct. I address only those that could possibly be material or significant.

Plaintiffs argue Wallace backdated the deeds transferring the Disputed Properties into trusts, and admitted backdating them. As explained above, I found he did neither: I found Wallace intentionally delayed recording the deeds in view of Ci Ci's pursuit of the properties, but saw no basis to conclude he backdated them.[261] Wallace did not admit to backdating them.[262]

---

of unclean hands is whether the plaintiff's conduct is so offensive to the integrity of the court that his claims should be denied, regardless of their merit." (citation omitted)).

[261] *See supra* note 184.

[262] *Id.*

Next, Plaintiffs argue Wallace's partnership theory is baseless and in bad faith because there is no documentary evidence of it.[263] It is well established that a partnership agreement may be oral and does not require documentary evidence.[264] And an unsupported argument, without more, falls far short of unclean hands.[265]

Finally, Plaintiffs assert Wallace lied in court.[266] While cross-examining Ci Ci, Wallace dramatically insisted that his signature on the 6th Avenue agreement with Wang was forged.[267] He repeated this declaration when he was under oath;[268] then, he recanted it, explaining someone from his office authorized to act on his behalf signed it.[269] This dalliance with an untruth concerned an expired agreement with a nonparty.[270] Wallace has not asked this Court for relief under this disputed agreement with Wang, and Plaintiffs are not parties to it.[271] It did not concern the causes of

---

[263] PostTB at 28.

[264] *Eisenman v. Seitz*, 25 A.2d 496, 496 (Del. Ch. 1942); *Handler v. Centerview P'rs Hldgs. L.P.*, 2024 WL 1775269, at *9 (Del. Ch. Apr. 24, 2024) (stating a partnership can be written, oral, or implied).

[265] *See In re Estate of Zamichieli*, 2024 WL 1480370, at *10 (Del. Ch. Apr. 5, 2024) (acknowledging the "[p]etitioner's quest for a surcharge . . . was suspect and ultimately proved largely unsupported" but findingg the petitioner's conduct was not "so offensive to the integrity of the court that his claims should be denied, regardless of their merit." (quoting *Salter*, 1991 WL 158969, at *4)).

[266] PostTB at 28–29.

[267] Tr. (Wallace) at 155–56.

[268] *Id.* (Wallace) at 260.

[269] *Id.* (Wallace) at 283, 320–21.

[270] JX 23; *see Aizen*, 285 A.3d at 485.

[271] JX 23; *see generally* Countercl.

47

action for which Wallace sought relief.[272]  Neither Plaintiffs nor Double Forest as third-party defendant have proven this lapse in honesty was directed at or of any concern to them.[273]  It is not immediate or necessary to Defendants' claims, and it does not merit the unclean hands defense.

### 2.  Defendants' Third Party Claims Against Double Forest

Defendants' Counts I, II, and III against Double Forest concern Wallace's alleged partnership with Li and Double Forest.  Count I seeks a declaratory judgment that a partnership exists between Wallace and Double Forest.[274]  Count II seeks a determination that Double Forest owed and breached its fiduciary duty of loyalty to Wallace.[275]  And Count III seeks a judicial dissolution and supervised winding up of the partnership with Double Forest.[276]  Judgment is entered in favor of Double Forest to Counts I, II, and III.

---

[272] *Nakahara*, 718 A.2d at 523 ("The standard, as applied by the Court of Chancery, is that the inequitable conduct must have an 'immediate and necessary' relation to the claims under which relief is sought." (quoting *Kousi*, 1991 WL 248408, at *3)); Countercl. ¶¶ 33–67.

[273] *Nakahara*, 718 A.2d at 523.  Plaintiffs failed to prove their own legal entitlement to the Disputed Properties.  *See, e.g.*, *supra* note 110.

[274] Countercl. ¶¶ 33–37.

[275] *Id.* ¶¶ 38–44.

[276] *Id.* ¶¶ 45–52.

Wallace claims he and Double Forest orally agreed to establish a partnership.[277] Wallace has the burden of proving each element of a partnership agreement by a preponderance of the evidence.[278] This standard of proof requires that the evidence shows that the fact at issue is "more likely than not."[279] "Whether a partnership, in the legal sense, exists, is a question of fact."[280] Where, as here, the suit is between the parties as partners, the Court expects the purported partner will "know the means whereby the fact of partnership may be proved."[281] And so, for these suits, "stricter proof is required of the existence of a partnership than where the action is by a third person."[282] Wallace has not met this burden.

A partnership is created by "any agreement, written, oral or implied, of the partners as to the affairs of a limited partnership and the conduct of its business."[283] The "'creation of a partnership is a question of intent[,]' that is, whether the purported partners intended to share losses and profits, control, and ownership."[284]

---

[277] *Id.* ¶¶ 33–37.

[278] *Grunstein v. Silva* (*Grunstein II*), 2014 WL 4473641, at *16 (Del. Ch. Sept. 5, 2014), *aff'd*, 113 A.3d 1080 (Del. 2015), and *aff'd sub nom. Dwyer v. Silva*, 113 A.3d 1080 (Del. 2015).

[279] *Id.* at *16.

[280] *Ellison v. Stuart*, 43 A. 836, 838 (Del. Super. 1899).

[281] *Id.*

[282] *Grunstein II*, 2011 WL 378782, at *9 (quoting *Grunstein v. Silva* (*Grunstein I*), 2011 WL 378782, at *9 (Del. Ch. Jan. 31, 2011)).

[283] 6 *Del. C.* § 17-101(14).

[284] *Grunstein II*, 2014 WL 4473641, at *16 (quoting *Grunstein I*, 2011 WL 378782, at *9).

49

"The evidence the Court may consider to determine whether such an obligation existed includes the language of any agreement between the parties, and the parties' acts, dealings, conduct, and admissions."[285]  Where there is no written agreement establishing a partnership, the Court can "base [a] decision[] [of its existence] solely on the credibility of the [p]arties."[286]

"[T]here is no singularly dispositive consideration that determines whether or not a partnership existed between two parties."[287]  But "[a]n intention or desire to form a general partnership cannot bring the legal relationship into being,"[288] and "something more than a mere common enterprise, or joint undertaking, is necessary to create" a partnership.[289]  "[T]he hallmark of a partnership is the 'common obligation to share losses as well as profits.'"[290]  Both are required; and so, even

---

[285] *Grunstein I*, 2011 WL 378782, at *9 (citing *Ramone v. Lang*, 2006 WL 905347, at *12 (Del. Ch. Apr. 3, 2006)).

[286] *Jackson v. Nocks*, 2018 WL 1935961, at *5 (Del. Ch. Apr. 24, 2018).

[287] *Ramone*, 2006 WL 4762877, at *12.

[288] *Cochran v. Nagle*, 1995 WL 819054, at *2 (Del. Ch. Feb. 27, 1996).

[289] *Garber v. Whittaker*, 174 A. 34, 36 (Del. Super. 1934).

[290] *Grunstein II*, 2014 WL 4473641, at *16 (quoting *Ramone*, 2006 WL 905347, at *12); *Plunkett v. Dillon*, 9 Del. 338, 384 (Del. 1872) ("The great test of the existence of a partnership between two or more persons is their participation both in profits and its losses . . . ."); *Garber*, 174 A. at 36 ("Under the rule applied in this state, it seems that in most cases, in order to constitute a partnership, as between the parties themselves, there must not only be an agreement to carry on some business or occupation jointly, but a like agreement, either express or implied, to share in business losses, as well as in business profits.").

50

when a party "admit[s] he expected to share any profits,"[291] "[w]here there is no intent to share profits and losses, there can be no partnership."[292] "The sharing of the profits without also sharing the loss will not constitute a partnership."[293] "The absence of a sharing of expenses"[294] or ownership and control[295] may also be considered evidence that a partnership does not exist.

Wallace claims he and Li entered a partnership agreement in 2015.[296] The Wallace-Li enterprise comprised two ventures: (1) supporting Ci Ci with rental income and (2) reselling homes for profit for Li and Wallace.[297] Wallace agreed to unfavorable obligations to Ci Ci in exchange for sharing profits with Li.[298] Wallace

[291] *Cochran*, 1995 WL 819054, at *2 (explaining plaintiff's admission of an agreement to share profits did not establish a partnership where "[t]he record indicate[d] [the plaintiff] did not intend to assume, nor did he ever assume, personal responsibility or liability for [the joint enterprise]" and there was a "conspicuous absence of an express, or implied, agreement to share in business losses.").

[292] *Hill v. Harris*, 1998 WL 960763, at *2 (Del. Super. Oct. 27, 1998).

[293] *Beecham v. Dodd*, 3 Del. 485, 485 (Super. 1842); *accord, Jackson*, 2018 WL 1935961, at *5 (holding no partnership was proven where evidence is completely bereft of an agreement to share losses).

[294] 68 C.J.S. Partnership § 73, Westlaw (database updated May 2024) ("The absence of a sharing of expenses may be considered evidence that a partnership does not exist, but the sharing of certain specific expenses is not evidence of the sharing of profits and losses.").

[295] *Grunstein II*, 2014 WL 4473641, at *19–22 (finding a partnership did not exist where the parties had not agreed on the control and ownership of a venture to be carried on as co-owners of a business for profit).

[296] *See, e.g.*, Tr. (Wallace) at 236–39, 262, 326.

[297] *See, e.g.*, *id.* (Wallace) at 236–39, 262, 326.

[298] *Id.* (Wallace) at 239–40 (detailing the unfavorable terms of the Initial Properties and Wallace explaining the only reason he agreed to them was because of the favorable

then alleges Double Forest assumed Li's obligations in the partnership, and Li and Wallace memorialized the terms in Li's notebook.[299]

Wallace's partnership claims fail because he has not established the parties agreed to share control and ownership. Wallace had no control in his enterprise with Li, or then with Double Forest. No matter how hard Wallace tried, he could not close Peoples Way because Li stopped responding;[300] Wallace surrendered his own rental properties and the proceeds from their sale because Li told him to;[301] Wallace

---

partnership benefits he would receive in flipping properties with Li and sharing their profits); *id.* (Wallace) at 150 ("[D]o you ever wonder why on earth I would do stuff like that? It's only because your dad promised that he will sell or buy ten properties from me each . . . month . . . . Otherwise, do I look like somebody who has mental issues? Why would I do things to cause myself to lose money?"); *id.* (Wallace) at 164 ("[W]hat kind of agreement do you think that was? Do you think that was fair to me, or you think I am maybe mentally challenged to agree to those kind of unfair agreements between me and your dad?"); *see* JX 7 at -1570, -1588, -1606 (memorializing these terms in subsequently entered agreements of sale); *see also* JX 18 at -2080 § 32 (indicating Wallace did not continue these terms in other purchase agreements with Xiaohan Li); JX 23 at -0359 § 32 (indicating Wallace did not continue these terms in other purchase agreements with Wang).

[299] Countercl. ¶ 5; Tr. (Wallace) at 103, 141, 151, 242, 306.

[300] Tr. (Ci Ci) at 21 (indicating the Li family sought release from the Peoples Way contract around January 2016); *id.* (Wallace) at 137–38.

[301] *Id.* (Wallace) at 88, 145, 238–40, 328.

acted as a buyer,[302] seller,[303] realtor,[304] property manager,[305] and rent subsidizer,[306] all at Li's direction;[307] and Wallace paid for Li's meals out[308] and served as Li's chauffeur.[309] Whatever Li directed, Wallace did, until he walked away. Wallace had no legal authority or control with the purchase of Darien Road.[310] Wallace worked as Double Forest's realtor and loaned Double Forest a substantial amount, but did not participate in the transaction decisions.[311] Li alone decided that Double Forest would acquire Darien Road,[312] and that Double Forest would give Darien

---

[302] JX 4 at 0484; Tr. (Wallace) at 225–26.

[303] Tr. (Wallace) at 238; JXs 7, 18, 23.

[304] Tr. (Wallace) at 232–33, 223 (indicating that to help Ci Ci's parents with Peoples Way, he asked his old brokerage firm how to reactivate his real estate license); JX 4 at -0492 (indicating Wallace entered the Peoples Way contract on November 27, 2015).

[305] Tr. (Wallace) at 245.

[306] *Id.* (Wallace) at 148–49, 263; JX 7 at -1570, -1588, -1606.

[307] Tr. (Wallace) at 237 ("I had to follow her dad's instruction."); *id.* 249 (the same); *id.* (Wallace) at 329 (the same); *id.* (Wallace) at 256 (indicating Ci Ci and Wallace "just . . . follow[ed] [Li's] instruction").

[308] *Id.* (Wallace) at 327 ("He never paid me anything. And he made me pay for breakfast, lunch, and dinner too."); *id.* (Wallace) at 163 ("[Li] made me pay for everything.").

[309] *Id.* (Wallace) at 163 (indicating Wallace spent "months of [his] time driv[ing] [Li] around every single day . . . [and] 12 hours was [his] minimum shift . . . .").

[310] *See*, *e.g.*, *id.* (Wallace) at 151, 224; JX 14 at -1952–54; *see also* Tr. (Wallace and Ci Ci) at 103–104.

[311] Tr. (Wallace) at 224, 266–67; JX 14 at 001953–54.

[312] JX 14 at -1953.

Road to Ci Ci, despite holding it out as a future showcase property for the Wallace-Double Forest enterprise.[313]

Most importantly, Li never agreed to share losses with Wallace. Instead, Li looked to Wallace to make up any rental shortfalls and provide Ci Ci with a steady income stream. Li yoked Wallace with all the rental properties' maintenance expenses.[314] And Li made Wallace pay for their daily expenses when they were together.[315] Wallace never identified a single piece of evidence that reflects any negotiation, let alone any agreement, with Li to share losses. As to profits, Li made Wallace give Ci Ci all the profits from selling his own property,[316] and, when Wallace asked for his share of the profits for one transaction, Li reprimanded him and denied any agreements obligating Li or Ci Ci to do anything for Wallace.[317]

---

[313] Countercl. ¶¶ 7–8; D.I. 79, Ex. A at 86:6–16 (indicating "Li claimed that he will buy [Darien Road] . . . so that he can bring clients from China to live in" and that Wallace later "found out . . . it was just a house for [Ci Ci] to live in. It wasn't, like her dad said, to use for business purposes.").

[314] Tr. (Wallace) at 327 ("If they did sign the contract and not giv[e] me the money, . . . now I[] [was] going to be in even a bigger hole. Because over the years I've put up all my money for the repairs, for the rents, even though the properties was vacant. I was already in the negatives."); id. (Wallace) at 149 ("Even if the tenants are not paying, I still pa[id]. Even if [the] property gets damaged, [I] . . . t[oo]k money out of my pocket to fix [the] damage. Who does that?").

[315] Id. (Wallace) at 163.

[316] Id. (Wallace) at 249.

[317] Id. (Wallace) at 145–46.

Wallace's "partnership claim[s] must fail."[318] There was never an agreement to share ownership and control in the alleged partnership business,[319] and "there was never 'a common obligation to share losses as well as profits.'"[320] Judgment on counterclaim counts I, II, and III is entered in Third Party Defendant's favor.

### 3. Defendants' Counterclaims Against New Start

Counterclaim counts IV and V are against Ci Ci and New Start. Count IV seeks a declaratory judgment that the Disputed Agreements are invalid.[321] Count V seeks damages for unjust enrichment.[322] Judgment is entered in Defendants' favor for Counts IV and V. Count VI, for breach of contract, is pled in the alternative, and I do not reach it.

### a. Declaratory Judgment

Defendants seek a declaratory judgment that the contracts to sell the Disputed Properties to New Start are invalid or unenforceable.[323] I have found neither Plaintiff signed those agreements at the time they were entered into, and that both were backdated for purposes of this litigation.[324] But Plaintiffs insist that "[r]egardless of

---

[318] *Jackson*, 2018 WL 1935961, at *5.

[319] *Grunstein II*, 2014 WL 4473641, at *22.

[320] *Jackson*, 2018 WL 1935961, at *5 (quoting *Ramone*, 2006 WL 4762877, at *12).

[321] Countercl. ¶¶ 53–59.

[322] *Id.* ¶¶ 60–67.

[323] *Id.* ¶ 59; 10 *Del. C.* § 6501.

[324] *See supra* note 110.

55

this disputed issue, exceptions to the statute of frauds exist when the party admits to an agreement or there is evidence of actual part performance of an oral agreement."[325] And they argue "the Court can rely upon part performance to establish that the parties agreed to the terms of the [Disputed Agreements]."[326] As an initial matter, for purposes of this analysis, I assume that Ci Ci accepted Wallace's offer by October 2016.[327] But Wallace's offer expired and the parties did not settle within the agreed-upon timeframe, so specific performance of settlement is not available.

"When interpreting a contract, the role of a court is to effectuate the parties' intent."[328] "Delaware adheres to the 'objective' theory of contracts, i.e. a contract's construction should be that which would be understood by an objective, reasonable third party."[329] "When the contract is clear and unambiguous, [I] will give effect to the plain-meaning of the contract's terms and provisions"[330] with the aid of

---

[325] PostTB at 16.

[326] *Id.* at 17.

[327] PostTB at 16–17.

[328] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

[329] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (quoting *NBC Universal v. Paxson Commc'ns Corp.*, 2005 WL 1038997, at *5 (Del.Ch. Apr. 29, 2005)).

[330] *Osborn*, 991 A.2d at 1159–60.

interpretive canons[331] and will not "read a contract to render a provision or term 'meaningless or illusory.'"[332] I will instead "read the specific provisions of the contract in light of the entire contract,"[333] "giving meaning to each term,"[334] and preferring "an interpretation which gives a reasonable, lawful, and effective meaning to all the terms . . . [over] an interpretation which leaves a part unreasonable, unlawful, or of no effect."[335] Likewise, I "cannot countenance an absurd interpretation of the contract."[336]

Here, the disputed contracts are clear and unambiguous. The contracts have identical provisions. Section 7 and Section 8 govern the time by which settlement must occur. Section 7 requires that settlement occur "within 30 days of acceptance," or "if a longer time is necessary to secure a survey, or to prepare the necessary legal and financial settlement documents," then within a "reasonable time to effect these

---

[331] *Bouchard v. Braidy Indus.*, 2020 WL 2036601, at *9 (Del. Ch. Apr. 28, 2020) ("[T]he court evaluates the relevant provision's semantics, syntax, and context, aided by interpretive canons." (quoting *JJS, Ltd. v. Steelpoint CP Hldgs., LLC*, 2019 WL 5092896, at *5 (Del. Ch. Oct. 11, 2019))).

[332] *Osborn*, 991 A.2d at 1159–60 (quoting *Sonitrol Hldg. Co. v. Marceau Investissements*, 607 A.2d 1177, 1183 (Del. 1992)).

[333] *West v. Village Practice Mgmt. Co., LLC*, 2023 WL 5447378, at *2 (Del. Ch. Aug. 24, 2023) (quoting *Ray Beyond Corp. v. Trimaran Fund Mgmt., LLC*, 2019 WL 366614, at *5 (Del. Ch. Jan. 29, 2019)).

[334] *Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 (Del. 2019).

[335] Restatement (Second) of Contracts § 203 (1981).

[336] *Osborn*, 991 A.2d at 1161.

conditions."[337]  Section 8 specifies that "[o]ther than those limited conditions related to settlement as noted in Paragraph 7 above, time is of the essence in this [a]greement."[338]  For these agreements, "[t]ime is of the essence means that the dates and time frames agreed by the parties must be met.  [And] [f]ailure to meet stated dates or time frames may result in waiver of contractual rights or default under the terms of th[e] [a]greement."[339]

Ci Ci and New Start argue that Section 32 held open all terms and conditions, including the timing to close, until October 31, 2019.[340]  According to Plaintiffs, Section 32 allegedly required Wallace "to deliver the Disputed Properties to Plaintiffs free and clear of liens and encumbrances" so long as Ci Ci pursued settlement by October 31, 2019.[341]

Section 32 states:

Property is being sold in as-is condition.  Seller will pay all closing costs including transfer taxes and any other fees or costs incurred. Seller agrees to be responcible [sic] for all maintenance and repair costs as well as the reimbursement of all rents when the current tenants do not pay as long as the property stays under the sellers [sic] property management.  All terms and conditions are effective until October 31, 2019.[342]

---

[337] JX 7 at -1583 § 7, -1601 § 7.

[338] JX 7 at -1583 § 8, -1601 § 8.

[339] JX 7 at -1583 § 8, -1601 § 8.

[340] PreTB at 15, 18; PostTB at 19; Tr. (Ci Ci) at 172–73.

[341] PreTB at 15.

[342] *See*, *e.g.*, JX 7 at -1570.

Plaintiffs would have me conclude that the provision's final clause, "[a]ll terms and conditions are effective until October 31, 2019," broadly applies to all terms of the contract, rather than narrowly to Section 32's "terms and conditions."[343] Plaintiffs conclude that after accepting the agreements in October 2016, "Plaintiffs could . . . close on the Unsettled Properties at any time prior to October 2019,"[344] notwithstanding the timing provisions in Sections 7 and 8.

This argument "an absurd, unfounded result" that not even Ci Ci can explain: a three-year period to close on an otherwise unremarkable purchase of residential rental properties.[345] Ci Ci acknowledged her reading of Section 32 was unusual.[346]

And basic contract principles require that Section 32's substantive content be read as distinct from and additional to the other provisions. I must "lean in favor of a construction which will render every word operative, rather than one which may

---

[343] Tr. (Ci Ci) at 26 ("I have the ability to close the property at any time until October 31, 2019."); *id.* (Ci Ci) at 180 ("So this sentence to me is showing if we sign this contract, I have the right to close anytime until October 31, 2019.").

[344] PostTB at 19; Tr. (Ci Ci) at 26, 180.

[345] *Osborn*, 991 A.2d at 1160.

[346] Tr. (Ci Ci) at 26 (indicating Ci Ci has never seen a provision like Section 32 in other real estate contracts).

make some idle and nugatory."[347]  Under Plaintiffs' interpretation, Section 32 would completely consume Sections 7 and 8.

In addition, Section 32 falls under the title "additional terms and conditions."[348]  A section's title "may be looked to in determining its meaning, because headings and titles provide context and can inform the meaning of the sections they label."[349]  While "contract headings are not controlling evidence of the meaning of a contract's substantive provisions, they may be considered" to support the interpretation of a substantive provision.[350]  Black's Law Dictionary defines "additional term" to be "a distinct, added term to a previous term,"[351] and the Cambridge dictionary defines "additional" as "more than what already exists."[352] And so, the title "additional terms and conditions" signals Section 32 is intended to

---

[347] Antonin Scalia & Bryan A. Garner, *Reading Law:  The Interpretation of Legal Texts* 174 (2012) (quoting Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States of the American Union* 58 (1868)); *see also Osborn*, 991 A.2d at 1159.

[348] *See, e.g.*, JX 7 at -1570.

[349] 11 Richard A. Lord, *Williston on Contracts* § 32:15 (4th ed. 2023).

[350] *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, at 581 n.35 (Del. Ch. July 12, 1998). The agreements contain no indication the headings should be given no effect in the construction or interpretation of the agreement.  *See, e.g.*, *Wilm. Tr. Co. v. Tropicana Ent., LLC*, 2008 WL 555914, at *2 n.15 (Del. Ch. Feb. 29, 2008) (refraining from employing a heading for interpretive value because, "by Section 13.13," the parties agreed "headings . . . ha[d] been inserted for convenience of reference only, and [we]re not to be considered a part" of the contract).

[351] *Additional Term*, Black's Law Dictionary (12th ed. 2024).

[352] *Additional*, Cambridge Dictionary, https://dictionary.cambridge.org/dictionary/ essential-british-english/additional (last visited September 1, 2024).

supplement, not supplant or replace, the other provisions. The substantive content that follows is intended to build upon what has already been expressed.

I read the final clause of Section 32, "[a]ll terms and conditions are effective until October 31, 2019," to modify only those terms and conditions expressed in Section 32. The clause does not modify any terms or conditions not expressed in Section 32.[353] My interpretation gives meaning to all terms and provisions, does not render any nugatory, and comports with Section 32's title and signaled intent to supply additional terms and conditions not yet expressed.

It is undisputed the parties did not settle the property within thirty days or even six months of Ci Ci's purported October 30, 2016, acceptance. Delaware courts consider the circumstances of the transaction when determining what constitutes "a reasonable time to perform."[354] Still, there are some generally applicable timeframes for real estate transactions. A "one-month delay in settlement is, as a matter of law, not unreasonable."[355] But "[a] delay of six months is not a usual or reasonable time for the settlement of a real estate transfer."[356] Ci Ci complains Wallace obstructed

---

[353] Were I to consider Ci Ci's claims, this clause could mean she was entitled to receive rent payments for the properties until October 31, 2019. *See, e.g.*, JX 7 at -1570.

[354] *Bryan v. Moore*, 863 A.2d 258, 261 (Del. Ch. 2004).

[355] *Id.*

[356] *Bernhardt v. Luke*, 126 A.2d 556, 558 (Del. 1956); *see Lewes Inv. Co., LLC v. Estate of Graves*, 2012 WL 5287945, at *15 (Del. Ch. Sept. 24, 2012) ("[T]he [defendants] committed a material breach of the [a]greement when they were unable to convey good

her ability to settle the properties around 2018;[357] Wallace asserts he blocked her communications closer to October 2017.[358] But even by then, Plaintiffs had failed to close on the properties within a reasonable time of October 2016, and Ci Ci has not even attempted to allege the delay was due to "the limited conditions related to settlement."[359] The parties failed to settle within Section 7's required time period. Wallace's offers of sale expired sometime in 2016. The terms and provisions in Section 32 also expired on October 31, 2019.

The Disputed Agreements are unenforceable.[360] Judgment will be entered in favor of Defendants on their counterclaim Count IV.

### b. Unjust Enrichment For Marshall Street and 6th Avenue Rental Income

Wallace also brings an unjust enrichment claim against Plaintiffs. Wallace maintains he never would have provided Ci Ci with rental income for Marshall Street

---

and marketable title to [the property] for more than five months after the 30–day grace period had expired.").

[357] Tr. (Ci Ci) at 69.

[358] *Id.* (Wallace) at 143–47, 323–24, 329–30.

[359] JX 7 at -1583 § 8, -1601 § 8; *see also* JX 7 at -1583 § 7, -1601 § 7 ("It is expressly agreed if a longer time is necessary to secure a survey, or to prepare the necessary legal and financial settlement documents, the date of settlement shall be extended for a reasonable time to effect these conditions.").

[360] *Cont'l Auto. Sys., Inc. v. Nokia Corp.*, 2023 WL 1370523, at *12 (Del. Ch. Jan. 31, 2023) ("The Court concluded that once the agreement expired" the agreement could no longer "be 'specifically enforced as written . . . .'" (quoting *All Pro Maids, Inc. v. Layton*, 2004 WL 1878784, at *12 (Del. Ch. Aug. 9, 2004))), *aff'd Layton v. All Pro Maids, Inc.*, 880 A.2d 1047 (Del. 2005) (TABLE).

and 6th Avenue but for her father's promises to repay him in other transactions, which never occurred. Plaintiffs have asserted a laches defense against this claim, which I determine fails. I find in Wallace's favor; Ci Ci and New Start have been unjustly enriched at Wallace's expense, and he is entitled to the amount of that enrichment.

### c. Ci Ci's Laches Defense Fails.

Plaintiffs have suffered no prejudice by Wallace's short delay in bringing his counterclaim. "The equitable doctrine of laches prevents a plaintiff from exercising unreasonable delay in bringing an action when that delay prejudices a defendant's rights."[361] "Although statutes of limitations always operate as a time-bar to actions at law, they are not controlling in equity."[362] "Nevertheless, because equity generally follows the law, 'a party's failure to file within the analogous period of limitations will be given great weight in deciding whether the claims are barred by laches.'"[363]

---

[361] *Deputy v. Deputy*, 2020 WL 1018554, at *47 (Del. Ch. Mar. 2, 2020) (quoting *Nationwide Mut. Ins. Co. v. Starr*, 575 A.2d 1083, 1088 (Del. 1990)).

[362] *Whittington v. Dragon Grp., L.L.C.*, 991 A.2d 1, 8 (Del. 2009) (citing *Reid v. Spazio*, 970 A.2d 176, 183 (Del. 2009)).

[363] *In re Ezcorp Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *8 (Del. Ch. Jan. 25, 2016) (citing *Whittington*, 991 A.2d at 9).

"Under Delaware law, the statute of limitations for unjust enrichment claims is three years."[364] Around December 2017, Wallace stopped paying Ci Ci rent on Marshall Street and 6th Avenue,[365] and he had already left the Wallace-Li enterprise behind.[366] Wallace did not file his counterclaims until three years and nine months after this date.[367] The legal statute of limitations passed nine months before Wallace filed his counterclaims.

I still conclude laches is not invoked because Plaintiffs have suffered no prejudice. While Wallace initially pursued a path of dismissing Plaintiffs' claims rather than launching his own, he raised his concern about the rent payments in his 2019 pro se answer, putting Plaintiffs on notice.[368] Because of its procedural deficiencies, I determined the pro se filing was not a formal answer and would not preclude Defendants from pursuing a motion to dismiss.[369] As the statute of

---

[364] *Buttonwood Tree Value P'rs, L.P. v. R. L. Polk & Co., Inc.*, 2023 WL 9053173, at *10 (Del. Ch. Dec. 29, 2023).

[365] PTO ¶ 30(xiv).

[366] Tr. (Wallace) at 147, 250.

[367] PostTB at 51 (acknowledging counterclaims filed three years and nine months after final rent payment).

[368] D.I. 4 ("[W]here is our pay back for all the repairs, the monthly rents . . .?").

[369] D.I. 28 at 4. If Wallace's filing was a valid answer, his counterclaims may, under Court of Chancery Rule 15(c), relate back to the conduct raised in that answer, and place his claim back within the statute of limitations. *See U.S. Borax & Chem. Corp. v. Szmokaluk*, 1981 WL 404963, at *2 (Del. Super. Ct. June 23, 1981) (allowing counterclaim "to relate back to the filing of the timely answer by defendants" because plaintiff had "notice by virtue" of similar claims timely filed by other party), *aff'd sub nom. Szmokoluk v. U.S. Borax & Chem. Corp.*, 474 A.2d 142 (Del. 1983); Ct. Ch. R. 15(c).

limitations came to a close at end of 2020, Defendants pursued a motion to dismiss with newly retained counsel.[370] Wallace counterclaimed promptly after it became clear the matter was progressing forward. And Wallace's claims arise from the same facts as Plaintiffs claims. Indeed, the same contracts Plaintiffs asked this Court to enforce set forth Wallace's obligation to pay rental income. Thus, any "[c]oncerns about lost evidence, faulty memories, or changing stories lack force."[371] Plaintiffs have suffered no prejudice at Wallace's nine-month delay.

I conclude Defendants' unjust enrichment claim is not barred by laches.

### d. Unjust Enrichment Is Not Barred By Contract.

I now turn to the merits of Wallace's claim that Plaintiffs were unjustly enriched by Wallace's payment to them of the monthly rent for the two Disputed Properties. The claim faces the initial hurdle of being brought in the context of a purported agreement between Wallace and Li, and purported agreements with New Start. Wallace agreed with Li he would pay Ci Ci the rent on the Disputed

---

[370] D.I. 17.

[371] *W. Palm Beach Firefighters' Pension Fund v. Moelis & Co.,* 310 A.3d 985, 996 (Del. Ch. 2024); *Daugherty v. Highland Cap. Mgmt., L.P.*, 2018 WL 3217738, at *7 (Del. Ch. June 29, 2018) ("The purpose for employing laches is partially similar to the purpose for respecting a limitations period at law: memories grow stale with time, evidence becomes lost, and individuals and entities are entitled to defend against claims in a reasonable amount of time, or not at all."); *see also Ord. of R.R. Telegraphers v. Ry. Express Agency*, 321 U.S. 342, 348–49 (1944) ("Statutes of limitation, like the equitable doctrine of laches, in their conclusive effects are designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared.").

Properties, and those rental obligations were reflected in the terms of the proposed agreements to sell the Disputed Properties to New Start.[372]  Because unjust enrichment "is an off-the-contract theory of recovery,"[373] it is generally inapplicable when the complained benefit is governed by a contract.[374]  But where the contract at issue was itself the unjust enrichment, such an agreement's putative governance will not bar an unjust enrichment claim.[375]  "In other words, '[t]he contract itself is not necessarily the measure of [the] plaintiff's right where the claim is premised on an allegation that the contract arose from wrongdoing (such as breach of fiduciary duty

---

[372] *See* JX 11 at -0843 § 32 ("Seller agrees to be responcible [sic] for all maintenance and repair costs as well as the reimbursement of all rents when the current tenants do not pay as long as the property stays under the sellers [sic] property management."); JX 12 at -0861 § 32 (same).

[373] *Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. 2003).

[374] *LVI Grp. Invs., LLC v. NCM Grp. Hldgs., LLC*, 2018 WL 1559936, at *17 (Del. Ch. Mar. 28, 2018) ("[W]hen the complaint alleges an express, enforceable contract that controls the parties' relationship, . . . a claim for unjust enrichment will be dismissed." (quoting *Bakerman v. Sidney Frank Importing Co., Inc.*, 2006 WL 3927242, at *18 (Del. Ch. Oct. 10, 2006))); *Yangaroo Inv. v. Digit. Media Servs., Inc.*, 2024 WL 2791100 at *12 (Del. Super. May 30, 2024) ("[Defendants] argue [the plaintiff's] unjust enrichment claim must be dismissed because this action is governed by [contract].  That is the general rule, but an exception applies here."); *see also Urvan v. AMMO, Inc.*, 2024 WL 863688, at *14 (Del. Ch. Feb. 27, 2024); *Adviser Invs., LLC v. Powell*, 2023 WL 6383242, at *8 (Del. Ch. Sept. 29, 2023).

[375] *LVI Grp. Invs.*, 2018 WL 1559936, at *17 (holding a contract did not control the parties' relationship when the execution of that contract itself enabled the defendants to obtain benefits to which they were not entitled); *McPadden v. Sidhu*, 964 A.2d 1262, 1276 (Del. Ch. 2008) (holding the unjust enrichment could be in the form of a contract for sale); *see also Powell*, 2023 WL 6383242, at *8 (declining to dismiss an unjust enrichment claim where the plaintiff alleged that the contract at issue itself arose from the defendants' fraud).

or fraud) or mistake and the [defendant] has been unjustly enriched by the benefits flowing from the contract.'"[376]

I begin with Wallace's agreement with Li. Where one party never intended to perform his promises, there could be no contract: there was instead a fraud. Nonperformance of a promise for future action is fraudulent if the intention not to perform exists when the promise is made.[377] "[A] speaker's intent not to perform 'may be inferred from the circumstances,'"[378] including evidence of "the promisor's subsequent conduct and speech."[379]

Li's repeated pattern with Wallace evidences Li made promises to Wallace with the intent not to perform them, particularly around October 2016 when Wallace signed the agreements containing his rental obligations. In 2015, Li promised to resell homes with Wallace, if Wallace would provide Ci Ci rental income; Wallace performed by transferring the Initial Properties to Ci Ci, but Li did not perform and

---

[376] *LVI Grp. Invs.*, 2018 WL 1559936, at *16 (quoting Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 12.01[b] (2016)).

[377] *See, e.g.*, *Vituli v. Carrols Corp.*, 2015 WL 5157215, at *6 (Del. Super. May 15, 2015) ("A 'contractual promise made with the undisclosed intention of not performing it is fraud.'" (quoting *Rsrvs. Dev. LLC v. Crystal Props., LLC*, 2009 WL 1514929, at *10 (Del. Super. Ct. May 18, 2009), *aff'd in part, rev'd in part on other grounds*, 986 A.2d 362 (Del. 2009))).

[378] *Id.* (quoting *Rsrvs. Dev.*, 2009 WL 1514929, at *9).

[379] 5 Am. Juris. *Proof of Facts* 3d 727 § 4, Westlaw (database updated Aug. 2024).

failed to close Peoples Way.[380]  By 2016, the Wallace-Li enterprise restarted and Li again promised to resell homes, if Wallace would provide Ci Ci rental income. Wallace again performed by signing agreements for Marshall Street and 6th Avenue, and paying Ci Ci their rental income.  But Li still did not perform any of his promises.  Indeed, around the same time Wallace signed the agreements, Li told Wallace he wanted to buy Darien Road to court prospective buyers, but actually bought it for Ci Ci's benefit.[381]  This, along with Li's prior behavior, reflects that Li had no intention to perform his promises to Wallace in the fall of 2016.  Thus, there was no valid contract between Wallace and Li when they restarted their venture and Wallace agreed to pay Ci Ci the rent on the Disputed Properties.

Any agreement Wallace made with New Start to make good on his promises to Li was therefore itself an unjust enrichment.  Wallace entered into that contract to pay New Start the rent on the Disputed Properties because he promised Li he would, in exchange for Li's promises to buy properties, resell them, and split the profits. Li's promises were fraudulent when made.  Because Wallace has shown the

---

[380] *See, e.g.*, Tr. (Ci Ci) at 21, 177.

[381] Countercl. ¶ 7, 8 ("The Darien Mansion and Lot were purchased by Li Company to court prospective property purchasers as part of its shared endeavor with Wallace. Indeed, both Wallace and Mr. Li, acting on behalf of Li Company, courted prospective buyers there, for a limited time."); D.I. 79, Ex. A at 86:6–16 (indicating "Li claimed that he will buy [Darien Road] . . . so that he can bring clients from China to live in" and that Wallace later "found out . . . it was just a house for [Ci Ci] to live in.  It wasn't, like her dad said, to use for business purposes.").

agreements themselves "arose from [Li's] fraud, the existence of that contract does not bar the unjust enrichment claim."[382]

Wallace's unjust enrichment claim is not barred by any contract with New Start or Ci Ci, or with Li.

### e. Plaintiffs Were Unjustly Enriched.

Unjust enrichment is the "unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity or good conscience."[383] To succeed on a claim for unjust enrichment, a complainant must prove: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, [and] (4) the absence of justification" for the benefit.[384] "Technically, [impoverishment] is not a necessary

---

[382] *LVI Grp. Invs.*, 2018 WL 1559936, at *17; *see also RCS Cred. Tr. v. Schorsch*, 2018 WL 1640169, at *7 (Del. Ch. Apr. 5, 2018) ("[T]he advisory agreements (and the benefits they conferred on the Advisor Defendants) resulted from the Control Defendants' breaches of fiduciary duty. The unjust enrichment claim is therefore not barred by the existence of binding contracts . . . ."); *McPadden*, 964 A.2d at 1276 (denying dismissal where "Plaintiff allege[d] that it is the letter of intent, itself, that is the unjust enrichment; that is, [Defendant's] manipulative conduct . . . unjustly enriched him in the form of the contract . . . ."); *Yangaroo,* 2024 WL 2791100, at *12–13; *see also Advanced Thermal Sci. Corp. v. Applied Mat'ls Inc.*, 2009 WL 10671186, at *8 (C.D. Cal. Oct. 2, 2009) ("[I]f [a] contract was procured by fraud, is unenforceable, or is otherwise ineffective, then an unjust enrichment claim may lie.").

[383] *McPadden*, 964 A.2d at 1276 (quoting *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988)).

[384] *State ex rel. Jennings v. Monsanto Co.*, 299 A.3d 372, 390 (Del. 2023).

element."[385] "The claim is about unjust enrichment, not impoverishment."[386] "A person who is unjustly enriched at the expense of another is subject to liability in restitution."[387]

Wallace has proven Plaintiffs were enriched at his expense. Over the course of several years, he paid Ci Ci or New Start approximately $22,017.50 in rental income for Marshall Street and 6th Avenue. Either he or the company he wholly owns directly provided Ci Ci and New Start the enriching contributions.[388] And there is an obvious and direct relationship between the enrichment and the impoverishment. One caused the other.

Lastly, Wallace has proven Plaintiffs' enrichment was unjustified. Ci Ci was aware of her father's false promises to Li. She initiated conversations with Wallace in 2015, and introduced her father to him shortly afterwards.[389] Ci Ci was present during certain negotiations and discussions between Wallace and Li;[390] she drove her parents to and from Wallace's home for certain meetings;[391] and she served as

---

[385] *Principal Growth Strategies, LLC v. AGH Parent, LLC*, 2024 WL 274246, at *12 (Del. Ch. Jan. 25, 2024).

[386] *Id.*

[387] Restatement (Third) of Restitution and Unjust Enrichment § 1, Westlaw (database updated Oct. 2023).

[388] JX 13; JX 21.

[389] Tr. (Wallace) at 105.

[390] *Id.* (Ci Ci) at 141.

[391] *Id.* (Ci Ci) at 105.

an intermediary for wire transfers from China.[392]  Ci Ci was instrumental in restoring

Wallace and Li's relationship after they fell out the first time.[393]  Despite feigning

ignorance at trial about the nature of Wallace's and Li's business venture,[394] Ci Ci

was aware Li and Wallace entered into a profit-sharing agreement.  She even

advocated for Wallace and negotiated for equal profit sharing with Li.[395]  Initially,

Li wanted to split profits 60/40 but "then Ci Ci said, you know what, I think 50/50

is fair."[396]

Ci Ci may not have known every detail of Li and Wallace's agreement.  But

she knew enough.  She knew Wallace agreed to fund her living expenses on the

condition her father resell homes with him and they split the profits equally.[397]  Ci

Ci benefited from Wallace continually performing his side of the bargain by paying

---

[392] *Id.* (Ci Ci) at 78; *see also* JX 2.

[393] Tr. (Wallace) at 136–41.

[394] *See, e.g.*, *id.* (Ci Ci and Wallace) at 141 ("'I don't know the conversations between you and my dad.' 'But you were -- you were there --'").  Instead of admitting what she knew about the Li-Wallace enterprise, Ci Ci instead attempted to erase her father entirely.  *Id.* (Wallace and Ci Ci) at 132 ("'I just wanted to know, do you think I'm here telling the truth that I was with your dad 100 percent of the time, I was not with you? Am I lying or no?' 'You're lying.'"); *see also supra* notes 77, 255.

[395] Tr. (Wallace) at 136–41.

[396] *Id.* (Wallace) at 242.  Ci Ci testified that she never had conversations with Wallace about profit sharing.  *Id.* (Ci Ci) at 193–94.  I find Wallace's testimony more credible.

[397] *Id.* (Wallace) 242, 141; *id.* (Wallace) at 322 (testifying, "me, you, and your daughter, we understand that crystal clear of a 50/50 split.  Because in the beginning, we agreed, you get 60 percent, I get 40 percent. And then your daughter, [Ci Ci], saying it's only fair when we do a 50/50.").

her thousands of dollars a month, while neither Li nor Ci Ci provided anything in return. Indeed, even before obtaining rental income for Marshall Street and 6th Avenue, Ci Ci benefited from Wallace's sale of the Initial Properties and their subsequent rental income. She unquestionably accepted Wallace's payment of the 9th Avenue proceeds, even though she knew she did not own that property; and she accepted and retained Wang's payment for 6th Avenue, knowing she did not own that property either.[398] Ci Ci knew the Peoples Way transaction fell through after Li ignored Wallace for weeks. Ci Ci, who was paramount in Wallace and Li reconciling,[399] knew Wallace and Li reunited on the condition their profits-sharing scheme continue. Despite this knowledge, she watched as Double Forest bought Darien Road to benefit her instead of the Wallace-Li enterprise, as Wallace believed.[400]

For over a year, Ci Ci watched as Wallace held up his end of the bargain while Li ignored his. At bottom, the preponderance of the evidence shows that Ci Ci knew Wallace acted on false and fraudulent promises. And yet Ci Ci happily pocketed the

---

[398] Tr. (Ci Ci) at 89–91; Am. Compl. ¶ 49 ("In June of 2017, [Ci Ci] spoke to her cousin, Yuci Wang, who was interested in purchasing the 6th Avenue for $160,000. Yuci Wang paid the equivalent of $160,000 to [Ci Ci's] family in China . . . ."); Tr. (Ci Ci) at 60–61.

[399] *Id.* (Wallace) at 136–41.

[400] JX 14 at -1953–54 (indicating Li was original buyer until buyer was switched Double Forest).

rental income from Marshall Street and 6th Avenue from November 2016 to December 2017. Ci Ci's acceptance was unjustified.

### f. Damages

Having found Wallace is entitled to recover on his unjust enrichment claim, I turn to the question of assessing his damages. "The most likely measure for damages under an unjust enrichment claim would be the amount by which [Plaintiffs] w[ere] unjustly enriched."[401] In other words, damages is measured "by [the beneficiary's] unjust enrichment, not by the [claimant's] loss."[402] "This often involves quantifying [the beneficiary's] profits."[403] Benefits received may be "measured in different ways," including quantifying the increased assets, market value of services, the value of any benefits received, and any gains realized upon the transfer or sale of an asset received from the claimant.[404] Wallace's unjust enrichment damages includes rent paid to Ci Ci for the 6th Avenue and Marshall Street properties, which amount to at least $34,943.37.

---

[401] *Frye v. Estate of Raphaelson*, 2023 WL 5624717, at *10 (Del. Ch. Aug. 31, 2023) (quoting *Mehta v. Smurfit-Stone Container Corp.*, 2014 WL 5438534, at *6 (Del. Ch. Oct. 20, 2014)).

[402] 1 Dan. B. Dobbs, Law of Remedies: Damages—Equity—Restitution § 4.5(1), at 628 (2d ed. 1993) [hereinafter Dobbs].

[403] *Schaffer v. Lockwood*, 2021 WL 5579050, at *22 (Del. Ch. Nov. 30, 2021).

[404] Dobbs § 4.1(4), at 566–67.

Defendants also seek pre- and postjudgment interest on any monetary award.[405] "Prejudgment interest is awarded as a matter of right. Such interest is to be computed from the date payment is due," in other words, from the date on which the "damages began to accrue."[406] In fixing the interest rate, the Court has "broad discretion, subject to principles of fairness."[407] "Under Delaware law, where neither party submits evidence showing the appropriate rate of interest, the court typically awards 5% over the Federal Reserve discount rate compounded quarterly."[408] "The Court . . . has discretion to select the compounding interval."[409]

Plaintiffs' enrichment was unjustified the moment Wallace made payments to them. Wallace is entitled to prejudgment interest at the legal rate, calculated with respect to each unjustified payment from the date such payment was made.[410] The accrual dates and prejudgment calculations are as follows:[411]

---

[405] Countercl. at 51.

[406] *Vivint Solar, Inc. v. Lundberg*, 2024 WL 2755380, at *37 (Del. Ch. May 30, 2024) (quoting *Citadel Hldg. Corp. v. Roven*, 603 A.2d 818, 826 (Del. 1992)); *Am. Gen. Corp. v. Continental Airlines Corp.*, 622 A.2d 1, at 13 (Del. Ch. 1992).

[407] *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, at 1190 (Del. Ch. 1999) (quoting *Summa Corp. v. Trans World Airlines, Inc.*, 540 A.2d 403, 409 (Del. 1988)).

[408] *Sweeney v. Sweeney*, 2024 WL 3040424, at *14 n.172 (Del. Ch. June 18, 2024).

[409] *Vivint Solar*, 2024 WL 2755380, at *37.

[410] *See id.* at *37.

[411] In the PreTB, Plaintiffs argue that any damages granted to Wallace for unjust enrichment should be setoff by amounts he retained from the Li family in connection with the failed purchase of Peoples Way. PreTB at 40. But Ci Ci seemingly abandoned this argument in her post-trial brief, so it is waived. *Oxbow Carbon & Mineral Hldgs., Inc. v.*

| Date of Payment | Month's Rent | Amount Unjustly Paid | Total After 5% Prejudgment Quarterly Compounding Interest |
|---|---|---|---|
| November 1, 2016 | November | $2,050[412] | $3,252.38 |
| January 20, 2017 | December | $2,050[413] | $3,204.31 |
| March 12, 2017 | February[414] | $2,050[415] | $3,264.04 |
| April 5, 2017 | March | $2,050[416] | $3,271.67 |

*Crestview-Oxbow Acq., LLC*, 202 A.3d 482, 502 n.77 (Del. 2019) ("The practice in the Court of Chancery is to find that an issue not raised in post-trial briefing has been waived, even if it was properly raised pre-trial."); *SinoMab Bioscience Ltd. v. Immunomedics, Inc.*, 2009 WL 1707891, at *12 n.71 (Del. Ch. June 16, 2009) ("Before trial, Immunomedics also asserted claims against Leung for breach of his duty of loyalty and against all three defendants . . . . But, Immunomedics did not address those claims in post-trial briefing, and they are waived."); *In re IBP, Inc. v. S'holders Litig.*, 789 A.2d 14, 62 (Del. Ch. 2001) (determining arguments not presented in an opening post-trial brief to be waived). Even if Plaintiffs did not waive their setoff argument, it fails because the three-year statute of limitations for setoff has passed. 10 *Del. C.* § 8120; *Finger Lakes Cap. P'rs, LLC v. Honeoye Lake Acq., LLC*, 151 A.3d 450, 453 (Del. 2016) ("By statute, setoff is subject to a three-year statute of limitations, and cannot be used to raise from the dead the earlier amounts. This makes sense, as a claim unrelated to the suit brought by the plaintiff should not gain new life from the happenstance of the plaintiff having sued the defendant on an unrelated matter." (footnote omitted)).

[412] PTO ¶ 29; JX 13. I relied on contemporaneous documents where possible to determine the exact breakdown of rent. Where there are no contemporaneous documents, I have relied on Ci Ci's breakdown of rents in the PTO. In the PTO, rent for 6th Avenue is listed as $1,100. PTO ¶ 29. Rent for Marshall Street is listed as $925-$975 a month. *Id.* I used the midpoint of $950.

[413] PTO ¶ 29; JX 13 at -0478.

[414] Ci Ci alleges no rent was paid for January. PTO ¶ 30. I am unaware of any documents rebutting this and therefore accept it as true.

[415] PTO ¶ 29; JX 13 at -0525.

[416] PTO ¶ 29; JX 13 at -0530.

| | | | |
|---|---|---|---|
| April 30, 2017 | April | $1,822.50[417] | $2,908.60 |
| June 1, 2017 | May | $1,822.50[418] | $2,908.60 |
| July 1, 2017 | June | $1,822.50[419] | $2,911.79 |
| August 1, 2017 | July | $2,050[420] | $3,275.26 |
| September 5, 2017 | August | $1822.50[421] | $2,911.79 |
| October 5, 2017 | September | $1822.50[422] | $2,863.47 |
| November 5, 2017 | October | $1,822.50[423] | $2,863.47 |
| December 5, 2017[424] | November | $832.50[425] | $1,308.00 |
| Total (with interest) | | $34,943.37 | |

Wallace is entitled to postjudgment interest in accordance with 6 *Del. C.* § 2301(a).[426] That statute is not cabined to the loan context but also "controls the

---

[417] JX 13 at -0548; JX 22 at -0220.

[418] JX 13 at -0580; JX 22 at -2213.

[419] JX 13 at -0605; JX 22 -0223.

[420] JX 13 at -0636.

[421] *Id.* at -0647; JX 22 at -2214.

[422] JX 13 at -0684; JX 22 -0225.

[423] JX 13 at -0718; JX 22 at -0226.

[424] PTO ¶¶ 29, 30(xiii).

[425] JX 22 at -0226.

[426] 6 *Del. C.* § 2301(a).

calculation of judgment interest outside of [it]."[427]  Prejudgment interest is included in the judgment that will bear postjudgment interest.[428]  Postjudgment interest accrues from the date of judgment, and "[it] shall be compounded quarterly."[429] Plaintiffs will be responsible for determining the postjudgment interest and including it in the amount paid to Wallace.

---

[427] *Noranda Aluminum Hldg. Corp. v. XL Ins. Am., Inc.*, 269 A.3d 974, at 978 (Del. 2021).

[428] *NGL Energy P'rs LP v. LCT Cap., LLC*, 2024 WL 2716005, at *7 (Del. May 28, 2024).

[429] *Vivint Solar*, 2024 WL 2755380, at *37.

### g. Defendants Are Entitled To Attorneys' Fees And Costs.

Defendants have requested fee shifting for "reasonable [a]ttorney [f]ees, expert fees (if any), plus expenses and costs of suit."[430] "Under the American Rule and Delaware law, litigants are normally responsible for paying their own litigation costs."[431] But there are recognized exceptions.[432] "One well-recognized exception to the American Rule is where the 'losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons'" in bringing the litigation or during the course of it.[433] "The purpose of this so-called 'bad faith' exception is to 'deter abusive litigation in the future, thereby avoiding harassment and protecting the integrity of the judicial process.'"[434] This Court may use its "equitable powers to award fees outside of an express statutory authorization or a contractual fee-shifting provision . . . where the judge concludes a litigant brought a case in bad faith or through h[er] bad faith conduct increased the litigation's cost."[435] Such an award is appropriate here.

As explained, Plaintiffs brought this case premised on a lie and sought to mislead the Court into believing it. Ci Ci falsified documents, withheld material

---

[430] Countercl. at 51.

[431] *Mahani v. Edix Media Grp., Inc.*, 935 A.2d 242, 245 (Del. 2007).

[432] *Brice v. State*, 704 A.2d 1176, 1178 (Del. 1998).

[433] *Kaung v. Cole Nat. Corp.*, 884 A.2d 500, 506 (Del. 2005) (quoting *Brice*, 704 A.2d at 1179); *Lynch*, 2020 WL 4381604, at *47 ("The Court recognizes an exception to this rule

78

communications, submitted false statements in a sworn filing and moved the Court to adopt them as facts for which no proof was required, lied on the stand, and when confronted with her lies, she lied more. Amid all that, she told this Court Wallace "[was] lying" when he was not.[436] She showed no regard for the judicial system in bringing this action that has spanned almost five years. Her conduct is egregious. Clear evidence supports a finding that Ci Ci initiated this action, brought her claims, and ultimately litigated those claims in bad faith. Defendants are entitled to fees they paid counsel while represented and their court costs under the bad faith exception.

## III. CONCLUSION

Judgment is entered in Defendants' favor on Plaintiffs' counts. Judgment is entered in favor of Third Party Defendant for Defendants' counterclaim Counts I, II, and III. It is entered in favor of Defendants for counterclaim Counts IV and V. Defendants are entitled to reasonable costs and fees incurred in litigating this action. Within twenty days, Defendants shall submit an affidavit under Court of Chancery

---

where the Court finds that the litigation was brought in bad faith or that a party has acted with bad faith during the course of litigation.").

[434] *Kaung*, 884 A.2d at 506 (quoting *Brice*, 704 A.2d at 1179).

[435] *ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*, 2013 WL 5152295, at *6 (Del. Ch. Sept. 16, 2013) (quoting *Burge v. Fid. Bond & Mortg. Co.*, 648 A.2d 414, 421 (Del. 1994)).

[436] Tr. (Ci Ci) at 132.

Rule 88 itemizing the amount of reasonable attorneys' fees and costs incurred.  A

final order and judgment will follow.